In re: **LABRANCHE SECURITIES LITIGATION**

**No. 03 Civ. 8201(RWS).**

United States District Court, S.D. New York.

Dec. 13, 2005.

Schiffrin & Barroway, Bala Cynwyd, PA (David Kessler, Eric Lechtzin, of counsel), Lerach Coughlin Stoia Geller Rudman & Robbins, Melville, NY (Samuel H. Rud-

man, Lawrence D. McCabe, of counsel), for Lead Plaintiffs and the Class.

Weil, Gotshal & Manges, New York, NY (Irwin H. Warren, Stephen A. Radin, Catherine Ciarletta, of counsel), Jones Day, New York, NY (E. Michael Bradley, Andrew J. Sockel, of counsel), for Defendants LaBranche & Co., Inc. and LaBranche & Co. LLC.

## OPINION

SWEET, District Judge.

Pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"), defendants LaBranche & Co. Inc. ("LaBranche & Co."), LaBranche & Co. LLC ("LaBranche LLC"), G. Michael LaBranche ("M.LaBranche"), William J. Burke, III ("Burke"), James G. Gallagher ("Gallagher"), Alfred O. Hayward, Jr. ("Hayward"), Robert M. Murphy ("Murphy"), S. Lawrence Prendergast ("Prendergast"), George E. Robb, Jr. ("Robb"), and Harvey S. Traison ("Traison")[1] (collectively "the Defendants") have moved to dismiss the Corrected Consolidated Class Action Complaint ("the Complaint") filed by lead plaintiffs Anthony Johnson, Clyde Farmer, Edwin Walthall, Donald Stahl, and the City of Harper Woods Retirement System (the "Plaintiffs") individually and on behalf of all others similarly situated. The Defendants have also moved for reconsideration of this Court's Memorandum Opinion of August 27, 2004, *In re LaBranche Sec. Litig.*, 333 F.Supp.2d 178 (S.D.N.Y.2004). The Plaintiffs have moved for an order compelling discovery from the Defendants.

For the reasons set forth below, Defendants' motion to dismiss the Complaint is granted in part and denied in part. Plaintiffs are granted leave to replead within

---

1. M. LaBranche, Burke, Gallagher, Hayward, Murphy, Prendergast, Robb, and Traison are described collectively herein as "the Individual Defendants."

thirty (30) days of entry of this Opinion. In light of the disposal of the Defendants' motion to dismiss the Complaint, Defendants' motion for reconsideration of the August 27, 2004 memorandum opinion and Plaintiffs' motion to compel discovery are both denied as moot.

### Prior Proceedings

This action was initiated on or about October 16, 2003. Pursuant to an opinion of this Court dated March 22, 2004, related actions were consolidated with the first-filed case, lead plaintiff was appointed, and lead plaintiff's choice of lead counsel was approved. *See Sofran v. LaBranche & Co., Inc.,* 220 F.R.D. 398 (S.D.N.Y.2004). On July 12, 2004, Plaintiffs filed the Corrected Consolidated Class Action Complaint ("the Complaint"). Pursuant to a Memorandum Opinion dated August 27, 2004, the Court lifted the automatic stay on discovery imposed by 15 U.S.C. § 78u–4(b)(3)(b). *See In re LaBranche Sec. Litig.,* 333 F.Supp.2d at 184. On September 13, 2004, Defendants moved for reconsideration of the August 27, 2004 Memorandum Opinion, and this motion was heard on October 13, 2004. On December 8, 2004, Defendants' motion to dismiss the Complaint pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6), which had been filed on August 16, 2004, was heard and marked as fully submitted. On May 4, 2005, the Plaintiffs motion to compel discovery, which was filed March 17, 2005, was heard and marked as fully submitted.

### The Parties

The Plaintiffs purchased the publicly traded common stock of LaBranche & Co. between August 19, 1999 and October 15, 2003 ("the Class Period").

LaBranche & Co. is a corporation organized and existing under the laws of Delaware with its principal place of business at One Exchange Plaza, New York, New York. LaBranche & Co. is a holding company that is the sole member of La-Branche LLC.

LaBranche LLC is a limited liability company and is the specialist subsidiary of LaBranche & Co. It has its principal place of business at 14 Wall Street, New York, New York. LaBranche LLC is the subsidiary through which LaBranche & Co. conducts equity specialist operations on the New York Stock Exchange ("NYSE") and the American Stock and Options Exchange ("Amex").

M. LaBranche has been Chief Executive Officer ("CEO"), Chairman, and President of LaBranche & Co. since the company's initial public offering ("IPO") in August 1999. M. LaBranche has served as Chairman of the Management Committee of LaBranche LLC since 1996, as a member of the Management Committee of LaBranche LLC since 1988, and as a specialist with LaBranche LLC since 1977. During the Class Period, he also served as Governor of the NYSE and as a member of the NYSE's Market Performance Committee.

Murphy became a member of La-Branche & Co.'s Board of Directors and CEO of LaBranche LLC on March 16, 2001. During the Class Period, Murphy served as Vice Chairman and Director of the NYSE.

Hayward has been a Director and Executive Vice President of LaBranche & Co. since the company's IPO. He has been a specialist with LaBranche LLC since 1983, and he as served as a member of the Management Committee of LaBranche LLC since 1994. He sits on the NYSE Arbitration Board.

Gallagher was a Director and Executive Vice President of LaBranche & Co. from August 1999 until his retirement in January 2003. He was a member of the Man-

agement Committee of LaBranche LLC from 1998 to January 2003.

Burke was Secretary of LaBranche & Co. during the Class Period. He has been Director of Business Development of La-Branche LLC since October 1999, and he was Director of Risk Management of La-Branche LLC from August 1999 to January 2003.

Traison has been LaBranche & Co.'s Senior Vice President and Chief Financial Officer ("CFO") since March 2000. Traison was a Director of LaBranche & Co. from March 2000 until January 2003.

Prendergast has been a Director of La-Branche & Co. and the company's Executive Vice President of Finance since the company's IPO.

Robb became a Director of LaBranche & Co. on March 16, 2001.

### The Action

The Complaint alleged that LaBranche & Co failed to disclose and misrepresented the following adverse facts, among others that: (1) LaBranche LLC specialists wrongfully engaged in the illegal practice of "trading ahead" at the NYSE, which involved wrongfully trading on non-public information in order to increase the firm's proprietary trading revenue; (2) LaBranche LLC engaged in illegal "inter-positioning" by causing or allowing its traders to put its own interest ahead of investors by ignoring one investor order while in the process of interacting with another investor, thereby creating illegal profits; (3) and LaBranche & Co., throughout the Class Period, improperly recognized revenue from its scheme in violation of Generally Accepted Accounting Principles ("GAAP").[2]

As a result of the failure to disclose these adverse facts, LaBranche & Co. is alleged to have materially overstated and artificially inflated its earnings, net income, and earnings per share, thereby causing its common stock to trade at an artificially inflated price. Count One of the Complaint alleges that the LaBranche LLC, LaBranche & Co, and certain of the Individual Defendants thereby violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), see 15 U.S.C. § 78 et seq., and Rule 10b–5 promulgated thereunder. See 17 C.F.R. § 240.10b–5. Count Two of the Complaint alleges that the Individual Defendants violated Section 20(a) of the Exchange Act by exercising control over LaBranche & Co. See 15 U.S.C. § 78t(a).

### Facts

The following facts are drawn from the Complaint and do not constitute findings of the Court.

The NYSE and the United States Securities and Exchange Committee ("SEC") investigations that brought LaBranche LLC's alleged improper trading practices to the attention of the investing public are described in Subsection A. The alleged false and misleading statements are described in Subsection B. Certain allegations relating to scienter are described in Subsection C.

### A. The Alleged Improper Conduct By LaBranche Specialists and Others

On August 19, 1999, LaBranche & Co. went public with an IPO of 11,5000,000 shares of common stock priced at $14 per share.

---

**2.** The details of the alleged underlying misconduct, the surrounding facts of which Plaintiffs allege LaBranche & Co. failed to disclose, have been outlined in a companion opinion issued by this Court, *In re NYSE Specialists Sec. Litig.*, No. 03 Civ. 8264, slip op. p. 7–11.

On January 13, 2003, the NYSE notified LaBranche & Co. that its Division of Market Surveillance ("DMS") had opened an investigation of LaBranche LLC in connection with the activities of individual specialists on the floor of the NYSE.

On April 16, 2003, LaBranche & Co's common stock closed at $17.73 per share.

On April 17, 2003, *The Wall Street Journal* reported that certain specialist firms were under investigation. *See* Kate Kelly & Susan Craig, *Big Board Is Probing Specialists For Possible "Front–Running"*, Wall St. J., Apr. 17, 2003, at A1. That same day, NYSE issued a one-paragraph statement disclosing that it had begun an investigation of trading abuses by several NYSE specialist firms. Also that day, LaBranche & Co. issued a press release containing the following alleged misstatement:

> Our specialists have always focused on putting the customers first, as proved by the superior price improvement that our specialists provide to our customers on a daily basis. LaBranche has always been committed to the regulatory framework of the NYSE and has responded promptly to any area of regulatory concern.

The April 17, 2003 closing price of LaBranche & Co. common stock was $16.49 per share.

On April 18, 2003, *The Wall Street Journal* reported that LaBranche LLC and other specialist firms were the subject of an investigation by the NYSE into whether they were providing inferior stock-execution quality to certain customers. *See* Kate Kelly & Susan Craig, *NYSE Probe Reaches 5 of 7 Specialist Firms—"Front–Running" Investigation Involves Biggest Companies*, Wall St. J., Apr. 18, 2003, at C1. That day, Bloomberg News reported that the SEC had begun an investigation of LaBranche and other NYSE specialist firms. *See* Eleanor Wason, *SEC Probing NYSE's Surveillance of Trading Activities*, *WSJ Says*, Bloomberg News, Apr. 18, 2003.

In the April 18, 2003 edition of *The Washington Post*, defendant M. LaBranche was quoted as saying "We work diligently to make sure our customers are getting the best prices available.... It is our duty to make sure their interests are protected." Philip Boroff (Bloomberg News), *Specialist Firms Scrutinized By NYSE*, Wash. Post, Apr. 18, 2003, at E2.

The April 21, 2003 closing price of LaBranche & Co. common stock was $16.29.

On April 22, 2003, *The Wall Street Journal* reported that compliance officers of six of the seven NYSE specialist firms, including LaBranche LLC, had met on March 20, 2003 to discuss concerns about front-running. *See* John Hechinger, *et al.*, *NYSE Probe Involves Dozens Of Stock Issues—Disclosure Of March Meeting Of Big Board Specialty Firms Reveals Scope of Investigation*, Wall St. J., Apr. 22, 2003, at C1. According to the article, "A number of firms attending the meeting had been asked to give testimony at the NYSE in the inquiry." *Id.*

On July 25, 2003, LaBranche & Co. disclosed that the NYSE Division of Enforcement had served LaBranche LLC with a charge memorandum due to its failure to produce email sent and/or received by LaBranche LLC employees (including specialists) in January 2002.

On August 27, 2003, LaBranche & Co. disclosed that an NYSE hearing panel had determined that LaBranche LLC had failed to cooperate with the ongoing NYSE investigation, and LaBranche LLC was ordered to turn over the January 2002 email.

On September 22, 2003, *The Wall Street Journal* reported that the SEC had inten-

sified its inquiry into LaBranche and other NYSE specialist firms. *See* Kate Kelly, Susanne Craig & Deborah Solomon, *SEC Intensifies Inquiry at NYSE Of Trading Firms—Move Comes as Big Board Names Reed Interim Chief; Regulatory Role Questioned,* Wall St. J., September 22, 2003, at Al. The article stated that the SEC investigation, which had initially focused on whether specialist traders had engaged in front-running, had been expanded to examine whether specialist traders had engaged in a second form of improper conduct, which the article characterizes as "trading ahead." *Id.* That day, LaBranche & Co. common stock closed at $16.05.

On October 1, 2003, LaBranche & Co. issued a press release stating, in pertinent part, that:

> [r]ecent media reports indicate that there is confusion about the scale of the investigation. After conferring with the NYSE, LaBranche estimates the activity under review would amount to a very small fraction of its trading revenues, substantially less than one percent. LaBranche said that it believes this would be the case for any period being reviewed to date by the NYSE and covers trading in all LaBranche Specialist stocks. While LaBranche takes every transaction seriously, it believes that the activity under review is statistically insignificant relative to its trading volumes. LaBranche also believes that the distraction caused by the investigation is disproportionate to its scope and looks forward to its resolution.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Provides Anticipated Third Quarter Results; Comments on NYSE Investigation," (Oct. 1, 2003) (*available at* http://www.labranche.com/newsinfo.html)). It is alleged

that this statement was materially false and misleading.

On October 16, 2003, the NYSE issued a press release stating, in pertinent part, that:

> The New York Stock Exchange Enforcement Division has informed five specialist firms that it has determined to bring disciplinary action against them. The actions will allege failure to comply with fundamental Exchange auction market rules and policies and applicable securities regulations during a three-year period from Jan. 1, 2000 through Dec. 31, 2002. The Exchange will also seek substantial fines and improvements in the self-monitoring and compliance practices of specialist firms, as well as reimbursement of potential investor losses.

> Additionally, the Exchange announced that it is implementing systems software at the point-of-sale to deter similar conduct in the future and to further enhance the Exchange's market surveillance efforts.

(Press Release, NYSE, "NYSE Informs Specialist Firms of Planned Disciplinary Action—Systems Software Being Implemented to Deter Improper Trading" (Oct. 16, 2003) (*available at* http://www.nyse.com/audience/media.html)). The above-described press release identified the following two forms of alleged misconduct by the specialist traders:

> In some situations the specialist had customer buy and sell orders on the electronic order book that should have been crossed and executed with or against each other, but instead the specialist traded for the firm account with each order to the disadvantage of the

customers.[3] In other situations, the electronic order book contained a customer order that could have been executed against a second order, but instead the specialist traded for the firm account with the second order, to the disadvantage of the customer order already on the book.[4]

(*Id.* (footnotes added)). That day, La-Branche & Co. common stock closed at $11.26 per share.

On October 21, 2003, LaBranche & Co. announced that in the third quarter of 2003, it had generated $70.9 million in revenue. (*See* 10/21/03 Form 8–K, Ex. 99.1, at 1). In the third quarter of 2002, LaBranche & Co. had generated $118.3 million in revenue. (*See id.*). LaBranche & Co. also announced that it had suspended its dividend.

On January 23, 2004, LaBranche issued a press release announcing that:

it has received a "Wells Notice" from the staff of the Securities and Exchange Commission notifying LaBranche that the staff is considering recommending that the Commission bring a civil enforcement action against LaBranche and its NYSE Specialist subsidiary, La-Branche & Co. LLC, for possible violations of securities laws and NYSE rules in the course of its Specialist trading activity.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Receives 'Wells Notice' From the SEC" (Jan. 23, 2004) (*available at* http://www.labranche.com/newsinfo.html)). LaBranche

& Co. also announced that it had received a similar notice from the NYSE.

On January 28, 2004, LaBranche & Co. announced its 2003 financial results. The company stated:

For the year ended December 31, 2003, revenue was $306.0 million compared to $452.8 million for the year ended December 31, 2002. Net loss available to common stockholders was $139.6 million, or $2.34 per diluted share, for the year ended December 31, 2003 compared to net income available to common stockholders of $80.3 million, or $1.34 per diluted share, for the year ended December 31, 2002.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Reports Fourth Quarter and Full Year 2003 Results" (Jan. 28, 2004) (*available at* http://www.labranche .com/newsinfo.html)).

On March 30, 2004, the SEC filed an order making findings and imposing remedial sanctions and a cease-and-desist order pursuant to Sections 15(b)(4) and 21C of the Securities Act of 1934. *See* Order Instituting Administrative And Cease–And–Desist Proceedings, Exchange Act Release No. 49,500, 82 SEC Docket 1903, 2004 WL 626573 (Mar. 30, 2004) (the "SEC Order"). The SEC Order provided a useful summary of a specialist's responsibilities and obligations:

4. In the NYSE's continuous two-way agency auction market, specialist firms are responsible for the quality of the markets in the securities in which individual specialists are registered. A specialist is expected to maintain, insofar as

---

**3.** The SEC has used the term "interpositioning" to describe this first form of alleged misconduct. *See* Press Release, U.S. Securities and Exchange Commission, "SEC Institutes Enforcement Action Against 20 Former New York Stock Exchange Specialists Alleging Pervasive Course of Fraudulent Trading"

(April 12, 2005) (*available at* http://www.sec.gov/news/press.shtml).

**4.** The SEC has used the term "trading ahead" to describe this second form of alleged misconduct. *See id.*

reasonably practicable, a "fair" and "orderly" market. A "fair" market is free from manipulative and deceptive practices, and affords no undue advantage to any participant. An "orderly" market is characterized by regular, reliable operations, with price continuity and depth, in which price movements are accompanied by appropriate volume, and unreasonable price variations between sales are avoided.

5. Specialists have two primary duties: performing their "negative obligation" to execute customer orders at the most advantageous price with minimal dealer intervention, and fulfilling their "affirmative obligation" to offset imbalances in supply and demand. Specialists participate as both broker (or agent), absenting themselves from the market to pair executable customer orders against each other, and as dealer (or principal), trading for the specialists' dealer or proprietary accounts when needed to facilitate price continuity and fill customer orders when there are no available contra parties to those orders.

6. Whether acting as brokers or dealers, specialists are required to hold the public's interest above their own and, as such, are prohibited from trading for their dealers' accounts ahead of pre-existing customer buy or sell orders that are executable against each other. When matchable customer buy and sell orders arrive at specialist's trading posts—generally either through the NYSE's Super Designated Order Turn-

around System ("DOT") [5] to an electronic display book (the "Display Book") [6] or by floor brokers gathered in front of the specialist's trading posts ("the crowd")— specialists are required to act as agent and cross or pair off those orders and to abstain from participating as principal or dealer.

(SEC Order ¶¶ 4–6, 2004 WL 626573, at *2).

The SEC Order also provided a useful summary of the alleged conduct that gave rise to this action:

7. During the period January 1999 through 2003, LaBranche breached its duty to refrain from dealing for its own account while in possession of executable buy and sell customer orders. Instead, LaBranche effected improper proprietary trades at the expense of customer orders.

8. Through the Display Book, the specialist reports trade executions electronically, and can view all the incoming DOT market and limit orders on both sides of the market. Executable buy and sell customer orders can appear on the Display Book at the same time. In such instances, specialists should simply "pair off" or cross the buy and sell orders. In numerous instances, however, LaBranche specialists improperly chose not to "pair off" or cross these buy and sell orders with each other. Sometimes, LaBranche specialists effected proprietary trades with orders that arrived electron-

**5.** The SEC Order explained that "the DOT system is the NYSE's primary order processing system, supporting equity trading on the trading floor and providing the NYSE with the current status of any equity order. Customers can transmit orders through NYSE member organizations electronically to the floor through the DOT system." (SEC Order, 2004 WL 626573, at *12 n. 2).

**6.** The SEC Order explained that "[t]he Display Book is an electronic workstation provided by the NYSE.... The Display Book allows specialists to ... receive and process orders, disseminate trade and quote information, report trade executions, research order and execution status, manage positions and view profit and loss in the dealer account." (SEC Order, 2004 WL 626573, at *12 n. 3).

ically through the DOT system to the Display Book. At other times, La-Branche specialists effected improper proprietary trades with orders that came in from the crowd. In either case, the disadvantaged order was a DOT order visible on the Display Book that the LaBranche specialist should have paired with the other order, instead of filling that other order through a proprietary trade.

(*Id.* at *3 (footnote omitted)).

More specifically, the SEC Order determined that LaBranche engaged in the following three categories of improper trading practices.[7]

### 1. *Interpositioning*

With respect to interpositioning, the SEC Order stated that "[a]t times from January 1999 through 2003, certain La-Branche specialists bought stock for the firm dealer account from the customer sell order, and then filled the customer buy order by selling from the dealer account at a higher price—thus realizing a profit for the firm dealer account." (*Id.* at *3). The SEC Order found that between 1999 and 2003, interpositioning by LaBranche LLC disadvantaged customers in the amount of $8,689,574. (*See id.*).

In particular, the SEC order focused on interpositioning by LaBranche LLC in a small number of stocks. The SEC order stated:

13. LaBranche's improper interpositioning transactions, in particular, were heavily concentrated in a few stocks

traded by a small number of specialists. Specifically, from . 1999 through 2003, 40.69% of LaBranche's customer disadvantage from interpositioning occurred in just six stocks—Nokia, Lucent Technologies Inc., Morgan Stanley, Tyco International Ltd., Compaq Computer Corp., and Merck & Co. Inc.

14. The interpositioning violations with respect to certain transactions in the six stocks listed above were done by certain LaBranche specialists with scienter. In such instances, certain LaBranche specialists disadvantaged a market buy order (i.e., a purchaser) and/or a sell order (i.e., a seller) because the specialist sold to the purchaser at one price and then bought from the seller at a lower price (or, alternatively, the specialist bought from the seller at one price and then sold to the purchaser at a higher price) instead of matching the purchaser and seller at a better market price for each.

15. Certain senior executives at La-Branche knew about the illicit trading because certain of the LaBranche specialists who were engaged in such interpositioning in these six stocks were senior executives at LaBranche, including managing directors, post managers, and a floor captain, some of whom had supervisory responsibility for LaBranche's trading activities on the NYSE floor.

(*Id.* at *5).

### 2. *Trading Ahead*

With respect to trading ahead, the SEC Order stated that:

---

7. In the facts section of their brief, Defendants argue that much of the customer disadvantage allegedly caused by LaBranche LLC's trading practices was an artifact of the SEC's determination that any trade would be deemed improper if (1) more than 10 seconds expired before a principal trade was completed and fully documented, and (2) during the pendency of such trade, a better price than

the one offered by the specialist became available from a third party. However, defendants do not appear to have asserted that the SEC's imposition of this so-called 10–second rule provides any basis for dismissal of the Complaint. Moreover, this is the type of issue of fact that is not appropriate for consideration on a Rule 12(b)(6) motion.

LaBranche specialists sometimes filled one agency order through a proprietary trade for the firm's account—and thereby improperly "traded ahead" of the other agency order. As a consequence, the customer order that was traded ahead of was disadvantaged by being executed at a price that was inferior to the price received by the dealer account. Unlike "interpositioning," the "trading ahead" violations did not necessarily involve a second specialist proprietary trade into the opposite, disadvantaged agency order. From January 1999 through 2003, trading ahead by certain LaBranche specialists resulted in customer disadvantage of $30,969,236.

(*Id.* at *4).

### 3. *Unexecuted Limit Orders*

With respect to unexecuted trade orders, the SEC Order stated that:

> LaBranche specialists traded ahead of executable limit orders—*i.e.,* they improperly effected proprietary trades with customer orders that they should have paired with marketable limit orders. Unlike the "trading ahead" violations described just above, in these instances the disadvantaged limit orders were never executed, but rather were cancelled by the customer before receiving an execution.

> Between 1999 and 2003, trading ahead of unexecuted limit orders by La-Branche caused $1,987,630 in customer disadvantage. This measurement is determined based on the difference between the price at which the order should have been executed and the price at the time of cancellation.

(*Id.* at *5).

The SEC Order determined that from 1999 through 2003, the above-described categories of conduct—*i.e.,* interpositioning, trading ahead, and unexecuted trade orders—resulted in customer disadvantage of $41,646,440. (*See id.* at *3). La-Branche LLC consented to the SEC Order without admitting or denying the findings contained therein. (*See id.* at *1). Pursuant to the SEC Order, LaBranche LLC agreed to pay a civil penalty in the amount of $21,872,320 and to disgorge $41,646,440. (*See id.* at *11).

In addition to the conduct identified in the SEC Order, the Plaintiffs allege that LaBranche LLC specialists would periodically freeze the Display Book orders, thereby preventing DOT orders from reaching the floor and being executed. While the Display Book was frozen, La-Branche LLC specialists would complete their own proprietary trades by either trading ahead or interpositioning and then restart the Display Book and complete the public investors' orders.

Plaintiffs allege that the above-described conduct violated the following NYSE rules governing the conduct of specialists: Rule 92 ("Limitations on Members' Trading Because of Customers' Orders"), Rule 104 ("Dealings by Specialists"), Rule 123B ("Exchange Automated Order Routing Systems"), Rule 342 ("Offices—Approval, Supervision and Control"), Rule 401 ("Business Conduct"), Rule 476(a)(6) ("conduct or proceeding inconsistent with just and equitable principles of trade"), and Rule 476(a)(7) ("acts detrimental to the interest or welfare of the Exchange").

### C. *Allegations Relating To Scienter*

The Plaintiffs allege scienter on the part of the Individual Defendants based on the fact that many of them had overlapping responsibilities with LaBranche LLC and LaBranche & Co. during the Class Period. Furthermore, M. LaBranche, Murphy, and Hayward also held leadership positions with the NYSE. The following table summarizes the positions that each Individual

Defendant is alleged to have held during the Class Period.

| Defendant | LaBranche LLC Duties | LaBranche & Co. Duties | NYSE Duties |
|---|---|---|---|
| M. LaBranche | Chairman of Management Committee (since 1996)<br><br>Member of Management Committee (since 1988)<br>Specialist (since 1977) | CEO, Chairman, President (since August 1999) | Governor<br><br>Member of NYSE Market Performance Committee |
| Murphy | CEO (03/16/01 to 11/03) | Director (03/16/01 to 11/03) | Vice Chairman<br><br>Director |
| Hayward | Member of Management Committee (since 1994)<br><br>Specialist (since 1983) | Director (since August 1999)<br><br>Executive Vice President (since August 1999) | Member of NYSE Arbitration Panel<br><br>Trustee of Buttonwood Association<br><br>Trustee of NYSE Gratuity Fund Former NYSE Floor Official Former Chairman of NYSE Allocation Committee |
| Gallagher | Member of the Management Committee (1998 to January 2003) | Director (08/99 to 01/03)<br><br>Executive Vice President (08/99 to 01/03) | |
| Burke | Director of Business Development (October 1999) Director of Risk Management (08/99 to 01/03) | Secretary | |
| Traison | | Senior Vice President (since March 2000) Chief Financial | |

Officer (since March 2000) Director (03/00 to 01/03)

Prendergast — Director (since 08/99) Executive Vice President (since 08/99)

Robb — Director (since March 16, 2001)

The Plaintiffs also allege scienter on the part of the Individual Defendants based on the fact that they owned shares of LaBranche & Co. during the Class Period. LaBranche & Co's Proxy Statements offer the following useful snapshot of ownership of common stock by the Individual Defendants:

| NAME | 2002 (as of 3/22/02) | | 2003 (as of 3/21/03) | | 2004 (as of 3/19/04) | |
|---|---|---|---|---|---|---|
| | # OF SHARES | % | # OF SHARES | % | # OF SHARES | % |
| M. LaBranche | 3,834,327 | 6.5 | 4,001,094 | 6.7 | 4,067,761 | 6.7 |
| Gallagher | 2,368,767 | 4.0 | 0 | * | * | * |
| Robb | 2,256,141 | 3.8 | * | * | * | * |
| Hayward | 1,974,734 | 3.4 | 1,956,468 | 3.3 | 1,966,468 | 3.3 |
| Murphy | 1,505,000 | 2.5 | 1,515,000 | 2.5 | * | * |
| Burke | * [8] | * | * | * | 700,800 | 1.2% |
| Prendergast | 207,000 | ● [9] | 207,000 | ● | 207.000 | ● |
| Traison | 39,333 | ● | 72,666 | ● | 106,000 | ● |
| All officers and directors | 12,188,392 | 20.7 | 8,457,892 | 13.9 | 7,063,034 | 11.6% |

(04/15/02 Proxy Statement, at 2; 04/16/03 Proxy Statement, at 3; 04/12/04 Proxy Statement, at 3). Furthermore, the Plaintiffs allege that M. LaBranche, Hayward, and Gallagher had the power to vote 52.9% of LaBranche & Co.'s common stock. As stated in the April 16, 2003 Proxy Statement:

Each of our managing directors at the time of our initial public offering in August 1999 entered into a stockholders' agreement pursuant to which he or she

**8.** The symbol " * " indicates that no data was required to be reported. (Proxy statements require the reporting of holdings for (1) any holder of more than 5% of a company's common stock, (2) directors, (3) the CEO, and (4) the four other highest paid executive officers.)

**9.** The symbol "●" indicates that the holding is equivalent to less than 1% of total shares outstanding.

agreed to vote his or her shares as determined by a majority of Messrs. LaBranche, Hayward and James G. Gallagher, a former director and executive officer of the Company who retired in January 2003. Messrs. LaBranche, Hayward and Gallagher beneficially own an aggregate of 8,037,662 shares of common stock, constituting approximately 13.2% of the outstanding shares of our common stock. As a result of the stockholders' agreement, Messrs. LaBranche, Hayward and Gallagher, acting together as a group, may be deemed to beneficially own an aggregate of 32,235,551 shares of common stock (including the 8,037,662 shares beneficially owned by them individually), constituting approximately 52.9% of the outstanding shares of our common stock. Each of Messrs. LaBranche, Hayward and Gallagher disclaims beneficial ownership of any and all shares of common stock held by any person or entity other than him.

(04/16/03 Proxy Statement, at 3 n. 1).

The Complaint alleges that LaBranche & Co.'s senior executives—*e.g.,* Burke, Gallagher, Hayward, M. LaBranche, Murphy, and Prendergast—received incentive-based cash and equity bonus compensation that was directly linked to the Company's overall performance, profit margins, and earnings per share, and that the Company derived 82 percent of its annual revenue from specialist trading for LaBranche & Co.'s own accounts.

Plaintiffs allege that the Defendants were motivated to inflate the value of LaBranche's common stock by a desire to acquire other specialists firms during the Class Period using as few shares as possible in order to avoid undue dilution of company stock. It is alleged that during the Class Period, LaBranche & Co. acquired ten other specialist firms and used its stock to fund many of these acquisitions. It is alleged that these acquisitions had the effect of doubling LaBranche & Co.'s share of the specialist industry, as measured by NYSE trade volume. In 1998, LaBranche LLC acted as specialist for approximately 14.2% of the dollar volume traded on the NYSE. By 2002, LaBranche LLC acted as specialist for some 27.2% of the dollar volume traded on the NYSE. These acquisitions occurred at time of industry-wide consolidation. It is alleged that during the Class Period, the total number of NYSE specialists firms dropped from 25 in 1999 to seven in 2003.

It is alleged that Burke, Gallagher, and Hayward sold significant holdings of LaBranche common stock during the Class Period. Gallagher allegedly sold 130,000 shares, generating proceeds of $3,016,767. Hayward allegedly sold 51,600 shares, generating proceeds of $1,554,634. Furthermore, it is alleged that Burke sold 101,420 shares and Hayward sold 312,429 shares pursuant to a 2002 forward contract with a Delaware trust.

Finally, the SEC Order contains allegations that in January 2000, the NYSE fined LaBranche LLC $1,000 for some eighteen instances of trading ahead; that in 2001, the NYSE issued an examination report which noted instances in which a LaBranche specialist traded ahead in two stocks; that between August 2002 and July 2003, the NYSE fined four LaBranche specialists $1,000 each for trading ahead; and that in February 2003, the NYSE issued LaBranche an admonition letter for excessively freezing the Display Book.

### Standards

Plaintiffs have alleged that Defendants' conduct gives rise to liability pursuant to Sections 10(b) and 20(a) of the Exchange Act.

Defendants have moved for dismissal of the Complaint pursuant to Fed.R.Civ.P. 12(b)(6), 9(b), and the PSLRA. In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002) (citing *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001)).

However, "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994). Furthermore, the truth of factual allegations that are contradicted by documents properly considered on a motion to dismiss need not be accepted. *See e.g., Rapoport v. Asia Elecs. Holding Co.*, 88 F.Supp.2d 179, 184 (S.D.N.Y.2000). The following materials may be considered on a Rule 12(b)(6) motion:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*In re Merrill Lynch & Co., Inc.*, 273 F.Supp.2d 351, 356–57 (S.D.N.Y.2003) (footnotes omitted).

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). In other words, " 'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 176 (2d Cir.2004) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir.2000); *accord Eternity Global Master Fund*, 375 F.3d at 176–77.

■ A claim under section 10(b) sounds in fraud and must therefore meet the pleading requirements of Rule 9(b), Fed. R.Civ.P. *See, e.g., In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69–70 (2d Cir. 2001). Such a claim must also satisfy certain requirements of the PSLRA. *See* 15 U.S.C. §§ 78u–4(b)(1) & 78u–4(b)(2); *see generally Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir.2000) (setting forth the heightened pleading standards of the PSLRA that must be met by a plaintiff who alleges securities fraud under Section 10(b) and Rule 10b–5); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir. 1994) (stating that "[s]ecurities fraud allegations under § 10(b) and Rule 10b–5 are subject to the pleading requirements of Rule 9(b)").

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The Second Circuit "has read Rule 9(b) to require that a complaint [alleging fraud] '(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)).

In particular, the plaintiff must allege facts that "give rise to a strong inference of fraudulent intent." *Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000). The Second Circuit has stated that this scienter requirement can be satisfied:

> "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"

*Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)).

Rule 8's general pleading requirement and Rule 9(b)'s particularity requirement must be read together. *See Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990) (stating that "Rule 9(b) ... must be read together with Rule 8(a) which requires only a 'short and plain statement' of the claims for relief"); *Credit & Fin. Corp. v. Warner & Swasey Co.,* 638 F.2d 563, 566 (2d Cir.1981) (same); *In re Initial Pub. Offering Sec. Litig. ("IPO"),* 241 F.Supp.2d 281, 327 (S.D.N.Y.2003). These two rules have been read together to mean that a plaintiff need not plead evidentiary details. *See, e.g., id.* The Second Circuit has stated that it does "not require the pleading of detailed evidentiary matter in securities litigation." *Scholastic,* 252 F.3d 63, 72.[10] Courts of this district have stated that "the

application of Rule 9(b) ... must not abrogate the concept of notice pleading." *IPO,* 241 F.Supp.2d at 327 n. 46.

## DISCUSSION

### I. *Plaintiffs' Section 10(b) Claim*

Count One of the Complaint asserts that LaBranche & Co., LaBranche LLC, Burke, Gallagher, Hayward, M. LaBranche, Murphy, and Traison violated Section 10(b) of the Exchange Act and Rule 10b–5. Section 10(b) provides in pertinent part as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
>
> . . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Rule 10b–5 provides in pertinent part as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

---

10. *See also Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1225 (1st Cir.1996) (stating that "in determining the adequacy of a complaint under [Rule 9(b)], we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence").

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

"The language of Section 10(b) and Rule 10b–5 does not explicitly create a private right of action. In fact, the legislative history fails to indicate whether Congress even contemplated creating such a right.... Nevertheless, courts long have held that a private right of action was indeed created." *Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 31 (2d Cir.2004).

To state a cause of action under Section 10(b) and Rule 10b–5 promulgated thereunder, a plaintiff must plead that the defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiff[ ] relied; and (5) that plaintiff['s] reliance

was the proximate cause of [the] injury." *In re Livent, Inc. Sec. Litig.*, 78 F.Supp.2d 194, 213 (S.D.N.Y.1999).

**A. Plaintiff's Section 10(b) Claim Is Dismissed As To Individual Defendants Who Did Not Make The Alleged False Statements**

Defendants' argue that each defendant can only be held liable pursuant to Section 10(b) and Rule 10b–5 for those statements actually made by that defendant.

**i. The Complaint States A Rule 10(b) Misrepresentation Claim Against LaBranche LLC** [11]

 Defendants assert that LaBranche LLC cannot be subject to primary liability for statements made by LaBranche & Co., its corporate parent. The Defendants cite two cases from this district to support its proposed *per se* rule that a subsidiary cannot be subjected to primary liability for statements made by its parent. *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *5–6 (S.D.N.Y. Aug.31, 2000); *Thomson Kernaghan & Co. v. Global Intellicom, Inc.*, Nos. 99 Civ. 3005(DLC), 99 Civ. 3015(DLC), 2000 WL 640653, at *4–5 (S.D.N.Y. May 17, 2000). The Plaintiffs counter that to hold LaBranche LLC liable for the misstatements in LaBranche &

**11.** Plaintiffs have argued that in addition to being liable for making false and misleading statements, LaBranche LLC is also liable for engaging in a manipulative scheme in violation of Section 10(b). Although it has been alleged that LaBranche LLC engaged in a manipulative scheme with respect to its customers (*i.e.*, buyers and sellers of securities on the NYSE), there are no allegations here LaBranche LLC engaged in a manipulative scheme with respect to investors in LaBranche & Co. common stock. In the absence of any such allegations, Plaintiffs, who are LaBranche & Co. investors, lack standing to assert a Section 10(b) manipulative scheme

claim against LaBranche LLC. It is axiomatic that in order to have standing, "a 10b–5 plaintiff in a private damages action must have been either a purchaser or seller of the securities that form the basis of the ... deceptive conduct." 2 Thomas Lee Hazen, *The Law of Securities Regulation* § 12.7[1] (5th ed.2005); *see also Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 37 (2d Cir.2005) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 754–55, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 463–64 (2d Cir.1952)).

Co's public filings and press releases, all that needs to be alleged is that "defendants were the original and knowing source of a misrepresentation and that defendants knew or should have known that misrepresentation would be communicated to investors...." *In re Kidder Peabody Sec. Litig.*, 10 F.Supp.2d 398, 407 (S.D.N.Y.1998).

The resolution of this issue hinges in large measure on the application of the Supreme Court's holding in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). As stated by the Second Circuit,

> [i]n *Central Bank*, the Supreme Court held that private civil liability under § 10(b) applies only to those who "engage in the manipulative or deceptive practice," but not to those "who aid and abet the violation." [511 U.S. at 167, 114 S.Ct. 1439]. The Court observed that "[a]iding and abetting is a method by which courts create secondary liability in persons *other than* the violator [or violators] of the statute." *Id.* at 184, 114 S.Ct. 1439 (quotation marks omitted) (emphasis added).

*SEC v. U.S. Envtl. Inc.*, 155 F.3d 107, 110–111 (2d Cir.1998). In the wake of *Central Bank*, the Second Circuit adopted a bright-line rule that in order to state a Section 10(b) misrepresentation claim, the plaintiff must allege that the defendant made a false or misleading statement. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir.1998) (affirming dismissal of 10b–5 claim against a company's auditor for approving false and misleading financial figures that were subsequently disseminated by the company) (quoting *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir.1997)). The *Wright* court stated that while the plaintiff need not allege that the defendant directly communicated the misrepresentation to in-

vestors, it is necessary that "the misrepresentation ... be attributed to [the defendant] at the time of public dissemination, that is, in advance of the [plaintiff's] investment decision." *Id.*

This bright-line public attribution rule notwithstanding, a subsequent Second Circuit panel held that under proper circumstances, a defendant can be held liable pursuant to Section 10(b) for a false and misleading statement even if the statement at issue was not attributed to the defendant at the time of its public dissemination. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75–76 (2d Cir.2001) (holding that a complaint properly pled primary violation of Section 10(b) by a company's vice president where facts were alleged demonstrating: (1) that the company had disseminated false and misleading statements to its investors, (2) that the defendant had primary responsibility for the company's communications with investors and securities analysts, and (3) that the defendant was "involved in the drafting, producing, reviewing and/or disseminating of false and misleading statements").

The *Scholastic* decision does not refer to *Wright*, and no subsequent Second Circuit panel has attempted to synthesize the two decisions. In the absence of guidance from the Second Circuit, some district courts have taken the position that *Scholastic* did not significantly alter the public attribution rule articulated in *Wright*. *See, e.g., In re Parmalat Sec. Litig.*, 376 F.Supp.2d 472 (S.D.N.Y.2005) (stating that the *Scholastic* court "did not question, let alone purport to set aside, the attribution rule set forth in *Wright* ...") Other courts have adopted the view that *Scholastic* relaxed *Wright's* public attribution requirement. *See, e.g., SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F.Supp.2d 454, 466 (S.D.N.Y.2004).

A useful synthesis of *Wright* and *Scholastic* can be found in *In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 330–32 (S.D.N.Y.2004). The *Global Crossing* court stated:

> [A] plaintiff may state a claim for primary liability under section 10(b) for a false statement (or omission), even where the statement is not publicly attributed to the defendant, where the defendant's participation is substantial enough that s/he may be deemed to have made the statement, and where investors are sufficiently aware of defendant's participation that they may be found to have relied on it as if the statement had been attributed to the defendant.

*Id.* at 332 (citing *In re Lernout & Hauspie Sec. Litig.*, 230 F.Supp.2d 152 (D.Mass. 2002)).

Pursuant to *Wright, Scholastic,* and *Global Crossing,* dismissal of Plaintiffs' Section 10(b) misrepresentation claim against LaBranche LLC is not warranted.

Plaintiffs contend that even though LaBranche & Co. did not clearly attribute the alleged misstatements to LaBranche LLC, LaBranche LLC may be held primarily liable for the statements disseminated by LaBranche & Co. where it is shown that it was "the original and knowing source of a misrepresentation and that [it] knew or should have known that the misrepresentation would be communicated to investors." *In re Kidder Peabody Sec. Litig.* 10 F.Supp.2d 398, 407 (S.D.N.Y.1998) (holding that a corporate subsidiary could be held primarily liable under Section 10(b) for statements made by the corporate parent where it was alleged that the subsidiary was the "original and knowing source" of the misstatements). The facts at issue here closely mirror those the *Kidder Peabody* court confronted. As in *Kidder Peabody,* "there is no dispute that [LaBranche LLC] provided [LaBranche & Co.] with financial data on a quarterly basis and that the data was incorporated in [LaBranche & Co.'s] financial statements and quarterly and annual reports." *Id.* at 407. When LaBranche & Co. reported LaBranche LLC's principal trading revenues, it was the "mere" conduit through which the information was disseminated. *Id.*

It should be noted that *Kidder Peabody* was decided prior to *Wright* and *Scholastic,* and as such, its continued viability has been called into question. It is determined, however, that regardless of the weight that should be accorded *Kidder Peabody,* Plaintiff's have adequately pled a Section 10(b) claim against LaBranche LLC in accordance with *Wright, Scholastic,* and *Global Crossing.* LaBranche LLC made material misstatements attributable to it at the time of dissemination upon "which a purchaser or seller of securities relied." *Central Bank,* 511 U.S. at 191, 114 S.Ct. 1439.

As in *In re Van Der Moolen,* LaBranche LLC is the subsidiary through which LaBranche & Co. conducts all of its specialist operations on the NYSE. (*See* Compl. ¶ 3). Under the circumstances, the misstatements—namely quarterly and annual reporting of principal trading revenues and profits for LaBranche & Co.'s specialist activity—could have come only from LaBranche LLC. In other words, when LaBranche & Co. disseminated financial information to the public regarding its specialist operations, it related only to the activity of LaBranche LLC and could have been provided only by LaBranche LLC. Additionally, because LaBranche & Co. referred only to the activity of LaBranche LLC in reporting its specialist earnings, investors may be deemed to have been "sufficiently aware of [LaBranche LLC's] participation that they may be found to have relied on it as if the statement[s] had been publicly attributed to [it]." *Global Crossing,* 322 F.Supp.2d

at 332. Under these facts, it is reasonable to infer that LaBranche LLC's financial data were incorporated directly into La-Branche & Co.'s public statements regarding the earnings of its specialist operations. Therefore, even though LaBranche & Co. failed to explicitly identify La-Branche LLC as the source of the information concerning revenue and earnings of its specialist operations, the misrepresentations may be constructively attributed to LaBranche LLC. *See id.* at 333 n. 14 (noting that a rule of constructive attribution comports with the Second Circuit's emphasis on reliance). To hold otherwise would enable parent companies to create subsidiaries under which all of its business would be conducted and then to shield the subsidiaries from section 10(b) liability by disseminating the subsidiary's false information. *See id.* at 333 (holding that the "strict requirement of public attribution would allow those primarily responsible for making false statements to avoid liability by remaining anonymous and thus would place a premium on concealment and subterfuge rather than on compliance with the federal securities laws." (internal quotations and citations omitted)).

For the reasons set forth above, Plaintiffs have adequately alleged that La-Branche & Co.'s misstatements regarding the earnings and revenue of its specialist operations may be attributed to La-Branche LLC.

### ii. *Plaintiffs Properly Rely on Group Pleading*

■ Defendants argue that many of the alleged misstatements upon which plaintiffs base their Section 10(b) claims were made by only one or a few defendants, and that Plaintiffs improperly rely on "group pleading" to attribute these statements to all of the defendants named in their Section 10(b) claim. Based on analogous facts, Defendants in the *In re Van Der Moolen N.V. Sec. Litig.* derivative action

asserted the same defense. For the reasons set forth in *In re Van Der Moolen N.V. Sec. Litig.*, No. 03 Civ. 8284, slip op. p. 20–22, the Defendants argument fails. Plaintiffs have properly relied on group pleading.

### iii. *Plaintiffs' Section 10(b) Claims Are Dismissed For Periods When Individual Defendants Were Not Directors of LaBranche & Co. or LaBranche LLC*

Defendants argue that Plaintiffs' Section 10(b) claims asserted against Gallagher, Murphy, and Traison should be dismissed for periods during which they were not directors or officers of LaBranche & Co. or LaBranche LLC. *See, e.g., In re Flag Telcom. Holdings, Ltd. Sec. Litig.*, 308 F.Supp.2d 249, 266 n. 7 (S.D.N.Y.2004). Plaintiffs do not contest this issue.

Therefore, with respect to Gallagher, Plaintiffs' Section 10(b) claim is dismissed as to any statements that were made after he retired from LaBranche & Co. in January, 2003. (*See* Compl. ¶ 26). With respect to Murphy, Plaintiffs' Section 10(b) claim is dismissed with respect to any statements made prior to March 16, 2001, the date on which he first became a La-Branche & Co. Director and CEO of La-Branche LLC. (*See* Compl. ¶ 23). With respect to Traison, Plaintiffs' Section 10(b) claim is dismissed as to any statements made prior to March 2000, the date on which he first became a Senior Vice President, CFO and a Director of LaBranche & Co. (*See* Compl. ¶ 28).

### B. *Plaintiffs Have Properly Alleged Scienter*

#### 1. *Plaintiffs Have Adequately Alleged That LaBranche & Co. Had Motive To Commit Fraud*

■ The Defendants do not dispute in this case that the Individual Defendants, who were officers and/or directors of La-

Branche & Co., had opportunity to commit fraud. However, they maintain that Plaintiffs have failed to properly allege that defendants had motive to commit fraud. The Second Circuit has stated that:

> [s]ufficient motive allegations " 'entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.' " *Novak,* 216 F.3d at 307 (quoting *Shields,* 25 F.3d at 1130). Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud. *Novak,* 216 F.3d at 307–08. Insufficient motives, we have held, can include (1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation. *Id.* (citing cases). On the other hand, we have held motive sufficiently pleaded where plaintiff alleged that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares. *Id.* (citing cases).

*Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001).

Plaintiffs have identified three alleged concrete benefits that the publication of the alleged misstatements provided to the defendants: (1) compensation from employment contracts that disproportionately emphasized earnings performance; (2) profit from unusual stock sales; and (3) protection of stock positions against the dilutive effect of stock-for-stock mergers.

### i. The Allegations Concerning The Individual Defendants' Desire To Increase The Value Of Their Bonuses Are Not Sufficient To Allege Motive To Commit Fraud

Plaintiffs argue that motive to commit fraud has been alleged based on allegations that the Individual Defendants received "generous" cash and equity bonuses. With respect to cash bonuses, the Complaint alleges that in 2000, M. LaBranche received some $3.45 million, Gallagher received $1.08 million, and Hayward received $1.95 million. With respect to equity bonuses, the Complaint alleges that in 2001, Traison received stock options with a potential value of $5.3 million, and Murphy received options with a potential value of $47.8 million. Plaintiffs argue that the sheer magnitude of the compensation at issue here is sufficient to make these allegations analytically distinct from those that the *Kalnit* court determined were inadequate as a matter of law to establish motive and opportunity. *See Kalnit,* 264 F.3d at 139 (stating that " 'incentive compensation can hardly be the basis on which an allegation of fraud is predicated.' " (quoting *Acito,* 47 F.3d at 54)). In support of this proposition, Plaintiffs have cited only one case from this Circuit: *In re Computer Assocs. Class Action Sec. Litig.,* 75 F.Supp.2d 68, 74 (E.D.N.Y.1999).

The *Computer Associates* court held that motive to commit fraud had been properly pled where it was alleged that three defendants would be granted over $1.15 billion of company stock if the company's common stock traded at or above a specified price for a minimum of 60 days during any 12 month period prior to March 2000. *See id.* at 74. The court reasoned that this "mammoth grant incentive" combined with the timing of the alleged misstatements, and the subsequent large and unexpected drop in the value of the company's stock were sufficient to allege motive to commit fraud. *See id.* There are no such mammoth sums of money at issue here to justify carving out an exception to the rule stated in *Kalnit.*

Therefore, it is determined that the allegations concerning the bonuses received by the Individual Defendants are inadequate to satisfy the scienter requirement.

### ii. *The Allegations Concerning Unusual Stock Sales By Insiders Are Not Sufficient To Adequately Plead Motive To Commit Fraud*

Plaintiffs allege that Defendants were motivated to commit fraud in order to facilitate insider trading. The Complaint alleges that Burke and Hayward sold 101,-420 and 312,429 shares of LaBranche & Co. common stock, respectively, pursuant to a January 18, 2002 registration statement. It is alleged that at the time, La-Branche & Co. common stock was trading at $33.74. The Complaint further alleges that in November and December of 2002, Hayward and Gallagher sold significant shares of their LaBranche & Co. holdings. Hayward is alleged to have sold some 51,-600 shares, thereby generating $1.55 million in proceeds. Gallagher is alleged to have sold some 130,000 shares, generating $3.01 million in proceeds. Furthermore, it is alleged that late 2002 sales by Hayward and Gallagher were made at a time that the Individual Defendants would have known that the NYSE had begun investigating various specialist firms—a fact that was allegedly not then known by the investing public.

The mere allegation of insider sales during the Class Period does not, without more, properly allege motive. Instead, Plaintiffs must further allege adequately that the insider sales were "unusual." *See Acito,* 47 F.3d at 54; *In re Hudson Techs., Inc. Sec. Litig.,* No. 98 Civ 1616(JGK), 1999 WL 767418, at *9 (S.D.N.Y. Sept. 28, 1999). The Second Circuit has stated that:

[i]nsider sales have been found unusual based on a variety of factors, including [1] the amount of profit from sales, *see In re Oxford Health Plans, Inc. Securities Litigation,* 187 F.R.D. 133, 140 (S.D.N.Y.1999) ($78 million profit from sale of 1.2 million shares during the class period is "massive by any measure") [;] ... [2] the portion of stockholdings sold, *see [Stevelman v. Alias Research Inc.,* 174 F.3d 79, 85 (2d Cir.1999) ] (president and CEO of company sold 40 percent of his stock holdings in company while making optimistic statements about company's financial position) [;][3] the change in volume of insider sales, *see In re Quintel Entertainment Inc. Securities Litigation,* 72 F.Supp.2d 283, 296 (S.D.N.Y.1999) (sales by corporate insiders represented 156 percent increase over total insider sales for fourteen months prior to start of class period) [;] and [4] the number of insiders selling, *see San Leandro,* 75 F.3d at 814 (company officer's $2 million profit from company stock sales did not suffice to prove motive, because no other company executives sold their shares during the relevant period).

*Rothman v. Gregor,* 220 F.3d 81, 94 (2d Cir.2000); *see also Scholastic,* 252 F.3d at 74–75.

Plaintiffs have alleged that the following proceeds were generated by the stock sales at issue: $3.42 million for Burke, $3.02 million for Gallagher, and $12.09 million for Hayward. However, they have not made allegations with respect to: (1) the portion of stockholdings sold by each Individual Defendant,[12] (2) any relevant change

---

**12.** Plaintiffs argue that the Individual Defendants have entered into agreements with La-Branche & Co. that restrict the sale of company stock, thereby making it impossible to determine what portion of the Individual Defendants' holdings were freely tradeable.

in volume of insider sales during the Class Period, or (3) the total numbers of insiders selling. Rather, the Plaintiffs merely assert that the trades of Burke, Gallagher, and Hayward were suspicious because: (1) the Defendants had not sold stock before the Class Period, and (2) the "vast proportion" of these sales were made at a time that the NYSE was preparing an investigation of the specialist firms, a fact that then was known to LaBranche & Co. insiders but not the investing public. The first argument—*i.e.*, that there were no stock sales prior to the commencement of the Class Period—fails: As Plaintiffs acknowledge on the second page of the Complaint, LaBranche & Co's IPO was held on the first day of the Class Period; no stock sales could have taken place prior to the start of the Class Period.

Plaintiff's second argument—*i.e.*, that the majority of the insider trades at issue were made when the investigation was imminent—is contradicted by the Complaint's allegations. According to the Complaint, Hayward and Burke, pursuant to a registration statement, sold some 413,849 shares of LaBranche & Co. common stock on January 18, 2002. (*See* Compl. ¶ 229). There is no allegation that the NYSE investigation was either underway or imminent in January 2002. Rather, the Complaint states that the NYSE investigation was launched in late 2002. Even assuming *arguendo* that M. LaBranche and Murphy were in a position to provide LaBranche & Co. with early warning of an impending NYSE investigation, they have alleged no facts that would support the inference that such warning could have been provided some twelve months prior to the investigation's launch. Therefore,

the argument concerning the allegedly suspicious timing of the sales fails with respect to these 413,849 shares, which constitute 69.5% of all shares allegedly sold by Hayward, Gallagher, and Burke during the Class Period. Moreover, Plaintiffs have identified nothing else that would render these the sale of these 413,849 shares suspicious.

With respect to the shares that Gallagher (130,000) and Hayward (51,600) are alleged to have sold in November or December of 2002, it is certainly true that these shares were sold shortly before the commencement of the NYSE investigation. However, it is also true that M. LaBranche and Murphy, the LaBranche & Co. insiders alleged to have had access to information from NYSE concerning the forthcoming investigation, are not alleged to have sold any of their shares. Moreover, a closer analysis of these two late 2002 transactions reveals that they are not adequate to properly allege motive to commit fraud.

According to LaBranche & Co's April 15, 2002 Proxy Statement, Gallagher held 2,368,767 shares of LaBranche & Co. common stock. Assuming that one third of these shares were transferable as of August 2002, Gallagher would have had approximately 789,589 transferable shares of LaBranche & Co. common stock at the time of the alleged sale. The 130,000 shares allegedly sold by Gallagher represents 16.5 percent of this total. In light of the fact that Gallagher retired from LaBranche & Co in January 2003 (*see* Compl. ¶ 26), a divestiture of this size in the last two months of 2002 is hardly suspicious. *See, e.g., In re Health Mgmt Sys., Inc. Sec.*

However, this argument ignores the fact that the terms of such restrictions are set forth in Section 1.2 of the August, 1999 Stockholders' Agreement. *See* 07/30/99 Form S–1A Registration Statement Ex. 10.8, at 2. As stated by

the Defendants, pursuant to these provisions, one third of such holdings was transferable as of August 2002, and another one third of such holdings was transferable as of August 2003.

*Litig.,* No. 97 Civ. 1865(HB), 1998 WL 283286, at *6 n. 3 (S.D.N.Y. June 1, 1998) (granting motion to dismiss Section 10(b) claim as to a former director who sold 81.9% of his shares in the defendant corporation during the Class Period because such sales were "most likely on account of the fact that the defendant had resigned as ... [a] director ... and was divesting himself of his shares"); *see also In re Corning,* No. 01 Civ. 6580(CJS), 2004 WL 1056063, at *29 (W.D.N.Y. Apr.9, 2004) (holding that a corporate officer's sale of 11% of his holdings of the company's common stock was not unusual "[w]hen considered in the context of his announced retirement, the timing of [his] stock sales and the relatively small percentage of his stock sold"). Based on the allegations contained in the Complaint and the other facts cognizable in the context of this Rule 12(b)(6) motion, it is determined that allegations concerning Gallagher's late 2002 transactions do not adequately plead motive to commit securities fraud.

With respect to Hayward, the April 15, 2002 Proxy Statement states that he held 1,974,734 shares, of which some 658,245 would have been transferable at the time of the alleged sales. The 51,000 shares allegedly sold by Hayward at the end of 2002 are equivalent to 7.8 percent of this total. Where, as here, the size of the transaction is relatively small in comparison to an insider's total holdings of the company's stock, the inference of scienter is weakened. *See In re Oxford Health Plans,* 187 F.R.D. 133, 140 (S.D.N.Y.1999) (citing *Acito,* 47 F.3d at 54). Moreover, courts of this district have held that "insider sales that represent less than ten percent of that insiders' total holdings are insufficiently 'unusual' to permit an inference of scienter." *In re Initial Public Offering Securities Litigation,* 241 F.Supp.2d 281, 367–68 (S.D.N.Y.2003). Based on the allegations contained in the

Complaint and the other facts cognizable in the context of this Rule 12(b)(6) motion, it is determined that allegations concerning Hayward's late 2002 transactions do not adequately plead motive to commit securities fraud.

Based on the foregoing, it is determined that the allegations concerning unusual stock sales by Burke, Gallagher, and Hayward are not sufficient to adequately plead motive to commit fraud.

### iii. *The Allegations Concerning Defendants' Desire To Fund Acquisitions Are Sufficient To Allege Motive*

Plaintiffs also allege that the Defendants artificially inflated the value of LaBranche & Co. stock in order to permit the company to use that stock to fund acquisitions. Defendants argue that the Second Circuit has held that allegations of this type are inadequate for the purpose of pleading motive. *See Rombach,* 355 F.3d at 177; *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 814 (2d Cir.1996). Plaintiffs argue that such allegations have been held sufficient for the purposes of pleading motive to commit fraud. *See Rothman,* 220 F.3d at 93–94 (stating that "[w]hether sufficient motive could be shown solely by an allegation of a high stock price artificially maintained in the context [of an] impending acquisition might well depend on the particular circumstances of the case, and ... is not the issue before us"); *In re Interpublic Sec. Litig.,* No. 02 Civ. 6527(DLC), 2003 WL 21250682, at *10 (S.D.N.Y. May 29, 2003) (stating that "[w]hile the simple purchase of one company by another may not ordinarily provide a sufficient allegation of a motive to commit fraud, a sustained and extensive plan to grow by acquisition, particularly through scores of acquisitions

paid for with a company's stock, as alleged here, may.").

The *Interpublic* court held that "the complaint sufficiently allege[d] that [defendant's] decision to grow by acquisition motivated [it] to inflate its reported earnings over the same period in order to have a higher stock price than it would otherwise have had." *Id.* at *12. In so holding, the *Interpublic* court noted that the complaint contained detailed allegations concerning the unusual scope of defendant's acquisition program. *Id.* at *11. That is, the complaint alleged that over the course of five years, the defendants made some 175 acquisitions involving some 116 million shares of the defendant's common stock. *Id.* at *4–5.

Here the Complaint contains detailed allegations that LaBranche & Co. engaged in a multi-year program of acquisitions. Pursuant to this program, LaBranche & Co. acquired ten of its competitors during the Class Period. It is alleged that some portion of these acquisitions were paid for with LaBranche & Co. stock. Furthermore, the scope of the LaBranche & Co. acquisition program was unusual in terms of its effect on the company's share of the specialist market: It is alleged that between 1998 and 2002, LaBranche & Co. increased its market share from 14.2% to 27.2%. Finally, Labranche & Co.'s acquisition program was unusual in that it coincided with a period of unprecedented industry-wide consolidation: It is alleged that during the Class Period, the total number of NYSE specialists firms dropped from 25 in 1999 to 7 in 2003. Based on the foregoing, it is determined that Plaintiffs have properly alleged that LaBranche & Co. had a motive to commit securities fraud.

However, Plaintiffs' conclusory allegations that the Individual Defendants sought to protect their individual stock positions from the dilutive effect of stock-for-stock mergers are inadequate for the purposes of alleging motive. The Complaint does not indicate what percentage ownership the Individual Defendants had at the time of the acquisitions at issue. It also does not state how the percentage ownership of the Individual Defendants might have changed as a result of these stock-for-stock mergers. Finally, it does not make any allegations concerning the effect that such stock-for-stock mergers might have had on the value of the holdings of the Individual Defendants or on their capacity to control or manage the company. The failure to make such allegations renders the allegations concerning dilution inadequate for the purpose of pleading motive to commit fraud. *See, e.g., Elliott Associates, L.P. v. Hayes,* 141 F.Supp.2d 344, 360 (S.D.N.Y.2000) (holding that conclusory allegations concerning the risk of dilution to defendants' equity positions do not adequately plead motive to commit securities fraud).

Based on the foregoing, it is determined that the Complaint has adequately alleged that LaBranche & Co. had motive to commit securities fraud. However, the Complaint fails to allege that the Individual Defendants had motive to commit securities fraud.

### 2. *Plaintiffs Adequately Allege Conscious Misbehavior or Recklessness*

■ Plaintiffs also assert that the Complaint has properly alleged that the Defendants recklessly disregarded information indicating that the company's financial statements were false and misleading. The Second Circuit has stated that:

[t]o survive dismissal [of a Section 10(b) claim] under the "conscious misbehavior" theory, the [plaintiffs] must show that they alleged reckless conduct by

the [defendants], which is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978) (internal quotation marks and alterations omitted). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." [*Chill*, 101 F.3d at 269] (internal quotation marks and alterations omitted). It is sufficient for appellants to allege "defendants' knowledge of facts or access to information contradicting their public statements." [*Novak*, 216 F.3d at 308]. *In re Carter–Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39–40 (2d Cir.2000).

The Second Circuit has stated that "conscious misbehavior" encompasses "deliberate illegal behavior," such as insider trading or knowing sale of company stock at an unwarranted discount. *Novak*, 216 F.3d at 308. In the context of securities fraud claims, the Second Circuit has defined "recklessness" as an "egregious refusal to see the obvious, or to investigate the doubtful." *Chill*, 101 F.3d at 269 (quoting *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F.Supp. 256, 259 (S.D.N.Y.1989) (internal quotations omitted)). The Second Circuit has "found allegations of recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308–09 (citing, *inter alia*, SEC v.

*McNulty*, 137 F.3d 732, 741 (2d Cir.1998) (holding that the pleading standard was met where the defendant allegedly included false statements in SEC filings that were so obviously suspicious that outside counsel had recommended against their inclusion); *see also In re WorldCom, Inc. Sec. Litig.*, 346 F.Supp.2d 628, 672 (S.D.N.Y.2004) (stating that "in an attempt to demonstrate recklessness, plaintiffs in Section 10(b) cases often assert that a defendant ignored 'red warning flags' of another actor's wrongdoing") (citing *Chill*, 101 F.3d at 269 [13]); *In re Philip Servs. Corp. Sec. Litig.*, 383 F.Supp.2d 463, 474 (S.D.N.Y.2004); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F.Supp.2d 314, 334 (S.D.N.Y.2001)).

Plaintiffs argue two theories of recklessness on the part of the Defendants: (1) that the alleged false and misleading statements concerned LaBranche & Co's core business and (2) that the Defendants ignored red flags concerning the alleged misconduct of LaBranche LLC specialists.

### i. Allegations Concerning the Relationship of the Alleged Misstatements To Plaintiffs' Core Business

Plaintiffs have cited no authority from this Circuit that supports the proposition that a strong inference of recklessness can be drawn from the fact that alleged false and misleading statements involve a defendant's core business. Rather, the cases cited by Plaintiffs in support of their "core business" theory are all "red flag" cases. That is, they all stand for the proposition that non-conclusory allegations that a corporate officer ignored "reasonably available data that would have indicated that [a company's] statements were false and mis-

---

**13.** It should be noted that the *Novak* court held that the mere failure of a "parent company to interpret extraordinarily positive performance by its subsidiary ... as a sign of problems and thus to investigate further does not amount to recklessness under the securities laws." *Novak*, 216 F.3d at 309 (citing *Chill*, 101 F.3d at 269–70).

leading" are adequate to plead reckless-ness or conscious disregard. *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 491 (S.D.N.Y.2004) (holding that complaint adequately alleged corporate officers' conscious disregard for falsity of financial statements where the company, an air cargo company, had ad-mitted that: (1) it knew during the class period that it had substantially overpaid for its cargo planes; (2) by the start of the class period, customers had recognized that its service was not cost effective; and (3) during the class period a significant number of its cargo planes were idle due to lack of demand); *see also In re Scholas-tic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir.2001) (holding that recklessness had been adequately alleged where complaint contained "detailed allegations as to what defendants knew on a daily, weekly, and monthly basis about the retail trade of the [company's product], while at the same time making public statements that paint-ed a different picture"); *Cosmas v. Has-sett*, 886 F.2d 8, 13 (2d Cir.1989) (holding that recklessness by corporate officers had been adequately alleged where complaint contained allegations that a company had announced that its Chinese markets were an important source of revenue at the same time that the Chinese government had announced trade restrictions that were certain to curtail company sales); *In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 448 (S.D.N.Y. 2000) (holding that recklessness on the part of a company's CFO and comptroller had been adequately alleged where reve-nue figures contained in 10–K and 10–Q

reports were "radically inflated" and it was alleged that the CFO and comptroller were "uniquely situated to control the [company's] revenue recognition proce-dures").

Based on the foregoing review of cases, it is determined that Plaintiffs' "core busi-ness" theory is duplicative of their "red flag" theory, which is analyzed below.

### ii. *Allegations That Defendants' Ig-nored Red Flags Concerning La-Branche LLC's Alleged Trading Abuses*

Plaintiffs argue that they have properly alleged that the Defendants ignored red flags that should have alerted them to the improper trading activity of LaBranche LLC specialists. The relevant allegations are as follows. First, it is alleged that the principal transactions comprised a signifi-cant portion of LaBranche & Co.'s reve-nue and that as the scope of LaBranche LLC's alleged trading abuses escalated, so did LaBranche & Co.'s revenue from prin-cipal transactions.[14] Second, it is alleged that M. LaBranche, Murphy, Hayward, Gallagher, Burke, and Traison were La-Branche & Co. officers and/or directors during the Class Period. Third, it is al-leged that during the Class Period, M. LaBranche, Hayward, Gallagher, and Burke were members of the LaBranche LLC management committee, and Mur-phy was the LaBranche LLC CEO. Fourth, it is alleged that M. LaBranche, Murphy, and Gallagher also held positions with the NYSE during the Class Period.

**14.** In 1999, 75.1% of LaBranche & Co.'s reve-nue derived from principal transactions, which provided $150.9 million in profit from principal transactions. (*See* Compl. ¶ 105.) In 2000, 82.1% of LaBranche & Co.'s revenue derived from such transactions, which provid-ed $282.9 million in profits. (*See id.* ¶ 128). In 2001, 80.1% of LaBranche & Co.'s revenue derived from such transactions, which provid-ed $340.7 million in profits. (*See id.* ¶ 156). In 2001, 80.1% of LaBranche & Co.'s revenue derived from such transactions, which provid-ed $340.7 million in profits. In 2002, 75.6% of LaBranche & Co.'s revenue derived from such transactions, which provided $342.4 mil-lion in profits. (*See id.*).

Fifth, it is alleged that the SEC Order stated that the specialists involved in the alleged trading abuses were senior executives at LaBranche LLC, including managing directors, post managers, and a floor captain. Sixth, it is alleged that M. LaBranche and Hayward were active specialists during the class period. Seventh, it is alleged that in January 2000, the NYSE fined LaBranche LLC $1,000 for some eighteen instances of trading ahead; that in 2001, the NYSE issued an examination report which noted instances in which a LaBranche specialist traded ahead in two stocks; that between August 2002 and July 2003, the NYSE fined four LaBranche specialists $1,000 each for trading ahead; and that in February 2003, the NYSE issued LaBranche an admonition letter for excessively freezing the Display Book. Finally, the Complaint alleges GAAP violations by LaBranche & Co.

Defendants argue that these allegations notwithstanding, Plaintiffs have failed to allege that any of the Individual Defendants were involved in any illegal trading practices or had actual knowledge of such practices. Likewise, Defendants argue that Plaintiffs have failed to properly allege that the illegal trading practices were so obvious that the Individual Defendants must have been aware of them. Defendants argue that the red flags described by the Plaintiffs are nothing more than *de minimis* violations that could not have alerted the Individual Defendants that LaBranche & Co's financial statements and other documents contained misstatements concerning the revenue derived from principal transactions.

In support of their "red flag" theory, Plaintiffs rely heavily on *In re Health Mgmt. Inc. Sec. Litig.*, 970 F.Supp. 192, 202 (E.D.N.Y.1997) (holding that reckless intent was properly pled where a complaint contained allegations that during the course of its preparation of a company's 10–K an auditor: (1) violated accepted auditing practices and (2) credulously accepted explanations provided by the company concerning its financial performance despite having access to contradictory information, including a letter by an analyst that warned that the company had misstated the value of its accounts receivable). Despite Plaintiffs' assertions to the contrary, *Health Management* does not stand for the broad proposition that the mere existence of information suggesting the possible falsity of a company's financial statements is adequate to give rise to a strong inference of reckless intent on the part of the company's officers and directors.

Furthermore, Plaintiffs have cited *Kalnit*, 264 F.3d at 143, and *Novak*, 216 F.3d at 311–312, for the proposition that to plead recklessness, Plaintiffs need only allege a pattern of regulatory violations. These cases did not so hold. Rather, they state the previously-described rule that securities fraud claims " 'typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.' " *Kalnit*, 264 F.3d at 142 (quoting *Novak*, 216 F.3d at 308).

Here, there are no non-conclusory allegations that any of the Individual Defendants had knowledge of the NYSE fines and infractions at any time during the Class Period. There are no allegations that a specialist firm, in the ordinary course of business, would typically bring NYSE fines or infractions such as the ones at issue here to the attention of its management committee or other members of

its top leadership. Nor are there any allegations that would support an inference that any of these individual NYSE actions were of a type that would be brought to the attention of a specialist firm's CEO or management committee members.

Rather, the Plaintiffs ask the Court to draw an inference about what the Individual Defendants likely knew or chose to ignore based merely on the corporate positions that they held. With respect to those individual defendants who are alleged merely to have held positions with LaBranche LLC and LaBranche & Co. (*i.e.*, Gallagher, Burke, and Traison), such an inference would be improper. *See, e.g., In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 603(RWS), 2004 WL 1415973, at *17 (S.D.N.Y. June 23, 2004) (holding that recklessness cannot be pled merely by alleging that based on a defendant's position in a company, it is likely that he or she had access to unspecified nonpublic adverse information); *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug.31, 2000) (stating that allegations that "defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions" are inadequate to properly plead scienter based on recklessness) (collecting cases); *In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 Civ. 1865(HB), 1998 WL 283286, at *6

(S.D.N.Y. June 1, 1998) (rejecting plaintiff's theory that based solely on defendants' membership on certain boards of directors, they "must have known the true seriousness of [a company's] problems").[15]

However, with respect to M. LaBranche, Murphy, and Hayward, Plaintiffs' allegations are different. It is alleged that in addition to their LaBranche & Co. and LaBranche LLC positions, each of these men also held a senior position with the NYSE during the Class Period. As stated in the accompanying *In re NYSE Specialists Sec. Litig.* (*see* slip op. at 40), the NYSE is a self-regulatory organization ("SRO") within the meaning of the Exchange Act. *See* 15 U.S.C. § 78c(a)(26). The Exchange Act delegates to NYSE, as an SRO, the authority to regulate its members and to enforce its members' compliance with the Exchange Act, the rules and regulations thereunder, and NYSE rules. *See* 15 U.S.C. § 78s(g)(1).

Given NYSE's quasi-governmental power to regulate the conduct of LaBranche LLC and other specialist firms, it is reasonable to infer that pursuant to their NYSE duties, M. LaBranche, Murphy, and Hayward were given access to information concerning disciplinary actions involving LaBranche LLC and other specialist firms.[16] Furthermore, it can be inferred that the senior positions that M. La-

---

**15.** It should be noted that the allegations here are different from those at issue in the Van der Moolen action, in which a contrary result was reached. There, it is alleged specifically that there were reports from the NYSE concerning specific instances in which Van Der Moolen specialists had engaged in improper trading practices and that these reports were available to members of the Van Der Moolen Specialists management committee. Based upon these allegations, it was determined reasonable to infer that the Individual Defendants, who were alleged to be members of the Van Der Moolen Specialists management committee, were aware or had access to the

NYSE reports. In contrast, here, Plaintiffs have not alleged that the Individual Defendants were aware or had access to the NYSE fines.

**16.** While it is conceivable that M. LaBranche, Murphy, and Hayward might have disregarded the January 2000 fine as an isolated incident involving a single specialist, the examination report issued at some unspecified time in 2001 was sufficient to put these three defendants on notice that illegal trading practices might be widespread at LaBranche LLC, thereby triggering a duty to investigate.

Branche, Murphy, and Hayward held in LaBranche LLC provided them with the requisite authority and access to information necessary to determine whether the conduct that triggered a given disciplinary action was isolated or symptomatic of the type of wide-scale violations that are alleged here. Finally, it is undisputed that each of these defendants, in their capacity as a LaBranche & Co. officer and/or director, owed duties to LaBranche & Co.'s shareholders.

Based on the foregoing, it is determined that the Complaint has properly pled that by December 31, 2001, at the latest, M. LaBranche, Murphy, and Hayward were recklessly disregarding red flags that LaBranche LLC was relying on illegal trading practices to generate revenue from principal transactions. For the purpose of stating a Section 10(b) claim, the recklessness of M. LaBranche, Murphy, and Hayward can be imputed to LaBranche LLC and LaBranche & Co. pursuant to traditional principles of agency. *See, e.g., Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir.2001); *Vento & Company of New York, LLC v. Metromedia Fiber Network, Inc.*, No. 97 Civ. 7751(JGK), 1999 WL 147732, at *12–13 (S.D.N.Y. Mar.18, 1999) (holding that a plaintiff may rely on agency principles to state a Section 10(b)).

■ Finally, Plaintiffs acknowledge that allegations concerning GAAP violations, absent sufficient allegations of fraudulent intent, are not sufficient to properly allege scienter. *See SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1241 (S.D.N.Y.1992). Since no such intent has been properly alleged here, the allegations concerning GAAP violations provided do not adequately plead reckless intent.

Based on the foregoing, it is determined that the Complaint adequately alleges that LaBranche & Co. had motive and opportu-

nity to commit fraud throughout the Class Period. It does not adequately allege that any of the Individual Defendants had motive to commit securities fraud. It also been properly alleged that from December 31, 2001 onward, M. LaBranche, Murphy, and Hayward acted with recklessness. Furthermore, the Complaint adequately alleges that LaBranche & Co. and LaBranche LLC recklessly disregarded the falsity of certain of its financial statements from December 31, 2001 until the end of the Class Period. Recklessness has not been adequately alleged with respect to Gallagher, Burke, and Traison.

## II. *The Complaint States A Section 20(a) Claim*

■ Count Two of the Complaint asserts that the Individual Defendants violated Section 20(a) of the Exchange Act. Section 20(a) imposes joint and several liability on any person who "controls any person liable under any provision of this title or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). In order to state a claim based on control person liability under Section 20(a), a plaintiff must allege "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996)); *Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475(SHS), 2002 WL 244597, at *7 (S.D.N.Y. Feb.20, 2002) (applying "culpable participation" requirement at pleading stage); *In re Emex Corp. Sec. Litig.*, No. 01 civ. 4886(SWK), 2002 WL 31093612, at *9 (S.D.N.Y. Sept. 18, 2002) (same).

In order to plead control person liability under Section 20(a), a plaintiff must "al-

lege a primary § 10(b) violation by a person controlled by the defendant and culpable participation by the defendant in the perpetration of the fraud". *Suez Equity Investors. L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 101 (2d Cir.2001) (holding that plaintiffs had stated a Section 20(a) claim against defendant bank where it was alleged that: (1) the person who had committed the alleged violation of Section 10(b) was an officer of the bank, and (2) the officer was responsible for the bank's relationship with a venture whose securities were the subject of the alleged Section 10(b) violation).

■ Here it is alleged that the Individual Defendants acted as controlling persons of LaBranche & Co. and LaBranche LLC. It is also alleged that LaBranche & Co. acted as a controlling person of LaBranche LLC.[17]

With respect to acting as controlling persons of LaBranche LLC, LaBranche & Co., and the Individual defendants argue that no control person liability can arise because no claim for a primary violation of

Section 10(b) has been stated against LaBranche LLC. Since it has been determined that the Plaintiffs have stated a Section 10(b) claim against LaBranche LLC, this argument fails.

The Individual Defendants and LaBranche & Co. also argue that Plaintiffs have failed to carry their burden of alleging particularized facts showing culpable participation in an underlying Section 10(b) fraud. In order to state a Section 20(a) claim, no such particularized allegations are required. *See In re WorldCom, Inc. Sec. Litig.* 294 F.Supp.2d 392, 415 (S.D.N.Y.2003) (stating that "[t]he concept of culpable participation describes that degree of control which is sufficient to render a person liable under Section 20(a). At the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard.") Here, it is alleged that the Individual Defendants exercised direct day-to-day management of LaBranche & Co. and LaBranche LLC, and that they had responsibility for their statements to the public.[18] Pursuant to the Second Circuit's holding in *Suez,* such

17. Defendants' argument that the Section 20(a) claim is untimely with respect to any conduct occurring prior to October 16, 2000 is unavailing. Pursuant to Section 804 of the Public Company Accounting Reform and Investor Protection Act of 2002 (the "Sarbanes–Oxley Act"), Pub.L. No. 107–204, 116 Stat. 745 (2002), a complaint filed on or after July 30, 2002 asserting a private securities fraud claim "may be brought no later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). This Court has previously taken the position that the limitations period in Sarbanes–Oxley applies to claims brought pursuant to sections 10(b) and 20(a) of the Exchange Act. *See Joffee v. Lehman Bros., Inc.,* No. 04 Civ.3507 RWS, 2005 WL 1492101, at *4 (S.D.N.Y. June 23, 2005) (citing *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 n. 2 (2d Cir.1993)); *Clark v. Nevis Capital Management, LLC,* No. 04 Civ. 2702(RWS), 2005 WL 488641, at *6 n. 3

(S.D.N.Y. Mar.2, 2005); *see also Marcus v. Frome,* 329 F.Supp.2d 464, 475 (S.D.N.Y. 2004) (stating that a section 20 claim based on a 10(b) violation is governed by the 10(b) statute of limitations).

18. Defendants argue that the Individual Defendants' controlling person liability should be limited to misstatements contained in SEC filings each Individual Defendant specifically signed. However, they cite no case law to support this assertion. Control is defined in 17 C.F.R. § 240.12b–2 as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." The fact that the Individual Defendants signed various SEC filings constitutes evidence of the control that they exercised over the operations of LaBranche LLC and LaBranche & Co. It does not, however, limit their liability to the specific SEC filings they signed.

allegations are adequate to state a Section 20(a) claim.

### III. *The Section 20A Claim Is Dismissed*

■■■ Count Three of the Complaint alleges that Gallagher violated Section 20A of the Exchange Act. As stated by a court of this district:

> Section 20A(a) of the 1934 Act provides that "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action ... to any person who ... has purchased ... or sold ... securities of the same class." 15 U.S.C. § 78t–1(a). The section creates a private right of action to enforce the existing prohibition on insider trading under § 10(b) case law, and does not create a new definition of insider trading. Thus, in order to state a claim under this section, plaintiffs must properly plead an independent cause of action for insider trading under § 10(b) of the 1934 Act. *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994).

*DeMarco v. Robertson Stephens Inc.*, 318 F.Supp.2d 110, 126 (S.D.N.Y.2004). As stated by the Individual Defendants, the Section 20A claim asserted against Gallagher rises or falls with Plaintiffs' Section 10(b) claim. Since a Section 10(b) claim has not been stated against Gallagher, it follows that a Section 20A claim has not been stated.

### Conclusion

As set forth above, Defendants' motion to dismiss the Complaint is granted in part

and denied in part, and Plaintiffs are granted leave to replead within sixty (60) days of entry of this Opinion.

As to Count One, the Individual Defendant's motion to dismiss is granted in part and denied in part. With respect to Murphy, the Complaint states a Section 10(b) claim as to those statements made on or after March 16, 2001. With respect to LaBranche and Hayward, the Complaint states a Section 10(b) claim. With respect to the remaining Individual Defendants, the motion to dismiss is granted. Plaintiffs have adequately alleged Section 10(b) violations against LaBranche LLC and LaBranche & Co.

As to Count Two, the motion is denied. Plaintiffs have adequately alleged that the Individual Defendants acted as controlling persons of LaBranche LLC and LaBranche & Co., in violation of Section 20(a). Plaintiffs have also adequately stated a claim against LaBranche & Co. as a controlling person of LaBranche LLC.

As to Count Three, Gallagher's motion to dismiss the Section 20A claim is granted.

Finally, in light of the disposal of Defendants' motion to dismiss, Defendants' motion for reconsideration and Plaintiffs' motion to compel discovery are both denied as moot.

It is so ordered.

### APPENDIX

#### *The Alleged False and Misleading Statements*

#### 1. *LaBranche's Initial Public Offering Registration Statements*

On June 18, 1999, LaBranche filed with the SEC a registration statement[1] and

---

1. Amended registration statements were filed on July 26, July 30, August 16, and August 18 Of 1999.

prospectus for the initial public offering of the company's common stock. Plaintiffs allege that the registration statement and its subsequent amendments—which were signed by M. LaBranche in his capacity as chairman and chief executive officer and by Gallagher and Hayward in their capacity as directors—contained the following statements which were rendered false and misleading by LaBranche's failure to disclose that it was engaged in improper trading practices.

The July 26, 1999 amended registration statement contained the following description of a specialist's responsibilities and obligations: [2]

Under the NYSE rules, a specialist has a duty to maintain, as far as practicable, a fair and orderly market in its specialist stocks. In order to fulfill its obligations, the specialist must at times trade for its own account, even when it may adversely affect the specialist's profitability. In addition, under some circumstances, the specialist is prohibited from making trades as principal in its specialist stocks. The specialist's obligations are briefly described below.

REQUIREMENT TO TRADE AS PRINCIPAL. A specialist must buy and sell securities as principal when necessary to minimize an actual or reasonably anticipated short-term imbalance between supply and demand in the auction market. The specialist must effect these transactions when their absence could result in an unreasonable lack of continuity and/or depth in their specialist stocks. The specialist is not expected to act as a barrier in a rising market or a support in a falling market, but must use its own judgment to try to keep such price increases and declines equitable and consistent with market conditions.

A specialist must make firm and continuous two-sided quotations that are timely and that accurately reflect market conditions. In making these quotations, the specialist's transactions are calculated to contribute to the maintenance of price continuity with reasonable depth. Following is an illustration of how a specialist acts as principal to maintain price continuity:

The most recent sale in a listed stock was $50, the best public bid (to buy) on the specialist's book is $49 3/4, and the best public offer (to sell) on the book is $50 1/4. A broker who wants to buy 100 shares at the market in this instance without a specialist would purchase at $50 1/4, the offer price. Similarly, a broker seeking to sell 100 shares without a specialist would receive $49 3/4, the bid price. The specialist, who is expected to provide reasonable price continuity, in this case might narrow the quote spread by offering or bidding for stock for its own account. In this instance, the broker who wants to buy 100 shares might buy at $50 1/16 from the specialist, as opposed to buying the same amount of shares from the best offer of $50 1/4, thereby offering price improvement to the customer. In the next trade, a broker willing to sell 100 shares might sell to the specialist at $50, as opposed to selling to the best available bid of $49 3/4, again achieving price improvement for the customer.

---

**2.** Substantially similar language concerning a specialist's responsibilities and obligations was contained in other financial disclosure statements filed by LaBranche. (*See* 03/20/03 10–K Statement for 2002, at 9–10; 03/15/02 10–K Statement for 2001, at 13–15; 03/30/01 10–K Statement for 2000, at 13–15; 4/04/00 Amended 10–K Statement for 1999, at 9–10; 03/30/00 10–K Statement for 1999, at 9–10)

TRADING RESTRICTIONS. In trading for its own account, the specialist must avoid initiating a market-destabilizing transaction. All purchases and sales must be reasonably necessary to permit the specialist to maintain, as far as practicable, a fair and orderly market in its specialist stocks. In addition, the specialist must comply with the following trading requirements:

— A specialist must first satisfy a customer's market buy order (an order to buy at the prevailing market price) before buying any stock for its own account. Similarly, a specialist must first satisfy a customer's market sell order (an order to sell at the prevailing market price) before selling any stock for its own account.

— A specialist must first satisfy a customer's limit order held by it before buying or selling at the same price for its own account. A limit order is an order either to buy only at or below a specified price, or to sell only at or above a specified price. A specialist may not have priority over any customer's limit order. A specialist, however, may buy or sell at the same price as a customer limit order as long as that limit order is executed first.

— If a public buyer wants to buy at a particular price and a seller wants to sell at the same price, the buyer and seller trade directly with each other, and the specialist should not interfere in the transaction.

— The specialist does not charge commissions for trades in which it acts as a principal.

— Except in some circumstances in less active markets, the specialist may not, without permission from an NYSE official, initiate destabilizing trades for its own account which cause the stock price to rise or fall.

— Any transactions by the specialist for its own account must be effected in a reasonable and orderly manner in relation to the condition of the general market, the market in the particular stock and the adequacy of the specialist's position to the immediate and reasonably anticipated needs of the market.

In addition, the specialist cannot be in a control relationship with any of its listed companies. This means a specialist may not acquire more than 5% of any common or preferred issue of its specialist stocks and may not own 10% or more of any common or preferred stock. A specialist should not hold any position as an officer or director or receive payments or loans or engage in business transactions with any of its listed companies.

(07/26/99 Amended Registration Statement, at 39–40.)

With respect to the company's revenue growth, the registration statement explained that:

[o]ur business has grown considerably during the past five years. The total annual share volume on the NYSE of stocks for which we act as specialist has increased from approximately 3.4 billion in 1994 to nearly 20.0 billion in 1998, representing a compound annual growth rate of 55.4%. During the same period, our annual revenues increased from $29.9 million to $126.4 million, representing a compound annual growth rate of 43.4%.

(06/18/99 Form S–1 Registration Statement at 1.)

The July 26, 1999 amended registration statement stated that "[n]et gain on principal transactions [*i.e.*, those involving trading in LaBranche proprietary accounts] increased 92.7% to $78.7 million for the six months ended June 30, 1999, from $40.8

million for the same period in 1998." (07/26/99 Form S–1/A Amended Registration Statement at 24.) During that same time "[c]ommissions revenue[3] increased 71.8% to $17.9 million for the six months ended June 30, 1999, from $10.4 million for the same period in 1998." (*Id.* at 25.)

## 2. *Third Quarter 1999 Earnings Release*

Plaintiffs allege that the following statements from Labranche's October 21, 1999 earnings release was false and misleading:

Pro forma revenues for the third quarter were $41.6 million, a 78% increase compared to pro forma revenues of $23.3 million in the third quarter in 1998. Pro forma net income for the quarter was $10.8 million, a significant increase over the pro forma $3.7 million recorded in the same quarter last year. Earnings per share, on a pro forma basis, were $0.24. The Company's pro forma net income after adding back non-cash expenses was $13.1 million, resulting in a cash-adjusted EPS of $0.29 on a pro forma basis.

\* \* \* \* \* \*

On August 19, 1999, LaBranche raised $235 million in net proceeds through the successful offerings of common stock and senior notes.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche's Earnings Per Share Reach $0.24 on a Pro Forma Basis for the Third Quarter," (Oct. 21, 1999) (*available at* http://www.labranche.com/newsinfo.html)).

3. The July 26, 1999 amended registration statement explained that "[c]ommissions revenue consists of commissions [LaBranche] earns when acting as agent to match buyers and sellers for limit orders executed by . . . on

## 3. *Third Quarter 1999 10–Q*

Plaintiffs allege that the following statements from LaBranche's November 15, 1999 quarterly report to the S.E.C., which was signed by M. LaBranche and LaBranche comptroller Todd Graber, contained the following false and misleading statements:

LABRANCHE'S QUARTERLY AND ANNUAL OPERATING RESULTS ARE AFFECTED BY A WIDE VARIETY OF FACTORS THAT COULD MATERIALLY AND ADVERSELY AFFECT ACTUAL RESULTS, INCLUDING: A DECREASE IN TRADING VOLUME ON THE NEW YORK STOCK EXCHANGE, VOLATILITY IN THE EQUITY SECURITIES MARKET AND CHANGES IN THE VALUE OF OUR SECURITIES POSITIONS. AS A RESULT OF THESE AND OTHER FACTORS, LABRANCHE MAY EXPERIENCE MATERIAL FLUCTUATIONS IN FUTURE OPERATING RESULTS ON A QUARTERLY OR ANNUAL BASIS, WHICH COULD MATERIALLY AND ADVERSELY AFFECT ITS BUSINESS, FINANCIAL CONDITION, OPERATING RESULTS, AND STOCK PRICE. AN INVESTMENT IN LABRANCHE INVOLVES VARIOUS RISKS, INCLUDING THOSE MENTIONED ABOVE AND THOSE WHICH ARE DETAILED FROM TIME TO TIME IN LABRANCHE'S SEC FILINGS.

\* \* \* \* \* \*

A majority of our specialist related revenues are derived from trading as principal. We also operate a proprietary

behalf of brokers after a specified period of time; [LaBranche] do[es] not earn commissions when [it] match[es] market orders." (07/26/99 Form S–1/A Amended Registration Statement at 22.)

trading desk separately from our NYSE specialist operations, which represented 6.2% of our total revenues in the nine months ended September 30, 1999 and 1.8% of our total revenues in 1998. These activities involve primarily the purchase, sale or short sale of securities for our own account. These activities are subject to a number of risks, including risks of price fluctuations and rapid changes in the liquidity of markets. In any period, we may incur trading losses in our specialist stocks for a variety of reasons, including price declines of our specialist stocks, lack of trading volume in our specialist stocks and the performance of our specialist obligations. From time to time, we have large position concentrations in securities of a single issuer or issuers engaged in a specific industry.

(11/15/99 10–Q Statement for the quarter ending September 30, 1999, at 15, 25.)

#### 4. *January 25, 2000 Earnings Release*

Plaintiffs allege that the following statement from the earnings release issued on January 25, 2000 were false and misleading:

Actual revenues for the fourth quarter grew 10% to $55.9 million from pro forma revenues of $50.9 million in the comparable quarter in 1998. Actual net income for the quarter grew to $15.6 million, 12% higher than the pro forma $14.0 million recorded in the same quarter last year. Actual earnings per share grew to $0.34 compared to pro forma $0.30 in the fourth quarter last year. The Company's actual net income after adding back non-cash expenses was $17.4 million, resulting in a cash-adjusted EPS of $0.38.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co Reports Revenue and Earnings Increases for the Fourth Quarter and Year," (Jan. 25, 2000) (*available at* http://www.labranche.com/newsinfo.html)).

Plaintiffs also allege that the following statements by M. LaBranche contained in the January 25, 2000 release were false and misleading:

We are pleased to report strong results for the fourth quarter. Our results are attributable to increased NYSE trading volumes in conjunction with our above-average level of participation in the stocks for which we act as a specialist. We continued to achieve substantial operating leverage during the quarter with net income growing at a higher rate than revenues . . . .

In the fourth quarter, we also took strategic steps to grow our business by acquiring two other specialist firms. Our pending acquisitions of Henderson Brothers and Webco Securities are consistent with our strategy of increasing our market share on the NYSE, and with them, LaBranche is positioned to become the leading specialist firm in terms of shares and dollar volume traded. We expect the combined transactions to be accretive to earnings when they close in the first quarter.

(*Id.*)

#### 5. *The 1999 Form 10–K Statement*

Plaintiffs allege that the March 30, 2000 annual report filed with the SEC—which was signed by M. LaBranche, Prendergast, Traison, Gallagher, and Hayward—contained the following false and misleading statements:

| | 1999 | 1998 | 1997 | 1996 | 1995 |
|---|---|---|---|---|---|
| **STATEMENT OF OPERATIONS DATA (in thousands)** | | | | | |
| **Revenues:** | | | | | |
| Net gain on principal transactions | $150,971 | $95,048 | $47,817 | $37,113 | $26,290 |
| Commissions | 37,222 | 26,576 | 15,186 | 10,180 | 7,736 |
| Other | 12,844 | 4,787 | 4,637 | 2,643 | 3,147 |
| Total revenues | 201,037 | 126,411 | 67,640 | 49,936 | 37,173 |

\* \* \* \* \* \*

Total revenues increased 59.0% to $201.0 million for 1999, from $126.4 million for 1998, principally due to the increase in revenue from net gain on principal transactions.

\* \* \* \* \* \*

Our revenues consist primarily of net gains earned from principal transactions in securities for which we act as specialist, and commissions revenue earned from specialist activities. Net gain on principal transactions represents trading gains net of trading losses and transaction fees, and are earned by us when we act as principal buying and selling our specialist stocks. These revenues are primarily affected by changes in share volume and fluctuations in price in our specialist stocks. Share volume for our specialist stocks has historically been driven by general trends in NYSE trading volume, as well as factors particularly affecting our listed companies, including increased merger and acquisition activity, stock splits, greater frequency of company news releases (i.e., earnings guidance and reports), heightened research analyst coverage and investor sentiment. Commissions revenue consists of commissions we earn when acting as agent to match buyers and sellers for limit orders executed by us on behalf of brokers after a specified period of time; we do not earn commissions when we match market orders. Commissions revenue is primarily affected by share volume of the trades executed by us as agent.

\* \* \* \* \* \*

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of LaBranche & Co Inc. and Subsidiaries as of December 31, 1999 and 1998, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 1999 in conformity with accounting principles generally accepted in the United States.

(11/15/99 10–K Statement for 1999, at 20, 24, 21–22, F–2 (Report of Independent Public Accountants).)

In addition, the 1999 10–K contained allegedly false and misleading statements concerning the NYSE rules governing specialist activities. (*See id.* at 9–10.) These statements are substantially similar to the previously discussed description of a specialist's responsibilities and obligations that appeared in the July 26, 1999 amended registration statement. (*See* subsection B1 above.)

**6. *The First Quarter 2000 Earnings Release***

Plaintiffs allege that the following statement from the earnings release issued on April 26, 2000 was false and misleading:

Revenues for the first quarter grew 65% to $78.7 million compared to $47.6 million in the same quarter last year. Net income was $20.6 million or $0.44 per diluted share for the first quarter. Earnings before interest, taxes, depreciation and amortization ("EBITDA") were $49.6 million. The Company's net income after adding back non-cash expenses was $23.6 million, or $0.51 per diluted share.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Reports Revenue and Earnings Increases For First Quarter," (Apr. 26, 2000) (*available at* http://www.labranche.com/newsinfo.html)).

Plaintiffs also allege that the following statements by M. LaBranche contained in the April 26, 2000 release were false and misleading:

We are pleased with our better than expected results for the first quarter. For the most part, these record financial results were internally driven as our recent acquisitions did not close until late in the quarter. By identifying opportunities to act as principal in our Specialist stocks, together with heavier volume on the NYSE, revenues increased by 65%. . . .

As a result of our two recent acquisitions, LaBranche has positioned itself as a leader in its industry and stands to benefit from growing volumes in the equity market. As the Specialist in more than 410 stocks, the volume in our listed stocks accounted for 21% of the total shares traded compared to 14% in 1999, and 23% of the dollar volume traded compared to 15% last year.

(*Id.*)

### 7. *The First Quarter 2000 10–Q*

Plaintiffs allege that LaBranche's May 15, 2000 quarterly report to the S.E.C., which was signed by M. LaBranche, contained the following false and misleading statements:

**For the Three Months Ended March 31, 2000**

| | 2000 | 1999 |
|---|---|---|
| **REVENUES (in thousands):** | | |
| Net gain on principal transactions | 65,391 | 36,366 |
| Commissions | 9,185 | 8,270 |
| Other | 4,114 | 2,985 |
| Total revenues | 78,690 | 47,621 |

\* \* \* \* \* \*

The unaudited interim condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10–Q and Article 10 of Regulation S–X.

\* \* \* \* \* \*

On March 2, 2000, we completed the acquisition of all the outstanding capital stock of Henderson Brothers for approximately $228.4 million in cash. In addition, on March 9, 2000, we acquired Webco through a merger for 2.8 million shares of our common stock, $11.0 million in cash and senior promissory notes in the aggregate principal amount of $3.0 million bearing interest of 10.0% per annum.

(5/15/00 10–Q Statement for the quarter ended March 31, 2000, at 4, 10, 16.) In addition the May 15, 2000 10–Q contained allegedly false and misleading statements concerning investor risk factors that were substantially similar to those contained in November 15, 1999 10–Q. (*See* subsection B3 above.)

## 8. The Second Quarter 2000 Earnings Release

Plaintiffs allege that the following statement from the earnings release issued on July 24, 2000 was false and misleading:

LaBranche & Co Inc. (N.Y.SE: LAB) today reported record second quarter revenues of $88 million, a 57% increase over the same period last year. Net income was $20 million, or $0.41 per diluted share. Net income after adding back non-cash expenses rose to a record $25 million for the second quarter, or $0.51 per diluted share.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co Inc. Reports Second Quarter Revenue and Earnings," (July 24, 2000) (*available at* http://www.labranche.com/newsinfo.html).)

Plaintiffs also allege that the following statement by M. LaBranche contained in the April 26, 2000 release was false and misleading: "Our second quarter results reflect the strength of LaBranche's growing volumes and marketplace position. Our company offers the highest quality service at low execution cost to benefit investors and the industry." (*Id.*)

## 9. The Second Quarter 2000 10-Q

Plaintiffs allege that LaBranche's August 14, 2000 quarterly report to the S.E.C., which was signed by Traison in his capacity as CFO, contained the following false and misleading statements:

**For the Three Months Ended June 30, 2000**

| | 2000 | 1999 |
|---|---|---|
| REVENUES (in thousands): | | |
| Net gain on principal transactions | 73,323 | 42,300 |
| Commissions | 11,147 | 9,615 |
| Other | 3,154 | 3,957 |
| Total revenues | 87,624 | 55,872 |

\* \* \* \* \* \*

The unaudited interim condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X.

(8/24/00 10-Q Statement for the quarter ended June 30, 2000, at 9.) In addition the August 24, 2000 10-Q contained an allegedly false and misleading statements concerning investor risk factors that were substantially similar to those contained in November 15, 1999 10-Q. (*See* subsection B3 above.)

## 10. The Third Quarter 2000 Earnings Release

Plaintiffs allege that the following statement from the earnings release issued on October 23, 2000 was false and misleading:

Revenues for the third quarter of $81 million were up 95% from $42 million in the same quarter last year. Net income of $19 million compares to $7 million in the comparable quarter last year. Earnings per diluted share were $0.38. Net income after adding back non-cash expenses was $24 million versus $9 million in the third quarter last year. After adding back non-cash expenses, earnings per diluted share were $0.48.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co Inc. Reports Significant Increases In Third Quarter Revenues and Earnings," (Oct. 23, 2000) (*available at* http://www.labranche.com/newsinfo.html).)

Plaintiffs also allege that the following statement by M. LaBranche contained in the October 23, 2000 release was false and misleading:

We are pleased to report solid year-over-year increases in revenues and earnings. The results reflect our position as a leading market maker in a growing marketplace. The proposed acquisition of Robb Peck McCooey Financial Services, Inc. will further solidify our position and add 137 names to our listed companies. Our strategy is to grow our market share as market structure changes lead to higher volume and an increased role for the Specialist.

(*Id.*)

### 11. *The Third Quarter 2000 10–Q*

Plaintiffs allege that LaBranche's November 14, 2000 quarterly report to the S.E.C., which was signed by Traison in his capacity as CFO, contained the following false and misleading statements:

**For the Three Months Ended September 30, 2000**

| | 2000 | 1999 |
|---|---|---|
| **REVENUES (in thousands):** | | |
| Net gain on principal transactions | 64,460 | 30,862 |
| Commissions | 12,035 | 8,777 |
| Other | 4,727 | 2,003 |
| Total revenues | 81,222 | 41,642 |

(11/14/00 10–Q Statement for the Quarter Ended September 30, 2000, at 4.) In addition the November 14, 2000 10–Q contained allegedly false and misleading statements concerning investor risk factors that were substantially similar to those contained in November 15, 1999 10–Q (*see* subsection B3 above) and a statement concerning compliance with G.A.A.P. and SEC regulations that was substantially similar to that contained in the August 24, 2000 10–Q (*see* subsection B9 above).

### 12. *The January 18, 2001 8–K and Press Release*

On January 18, 2001, LaBranche filed and 8–K disclosure form with the SEC announcing the acquisition of ROBB PECK McCOOEY Financial Services Inc. ("RPM"), the parent company of NYSE specialist firm ROBB PECK McCOOEY Specialist Corporation. The Plaintiffs allege that the following statement from the 8–K, which was signed by Traison as CFO, was false and misleading:

On January 18, 2001, LaBranche & Co Inc. ("LaBranche") and ROBB PECK McCOOEY Financial Services, Inc. ("RPM") entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which LaBranche will acquire RPM by process of a merger (the "Merger"). As a result of the Merger, the stockholders of RPM will receive approximately 6.9 million shares of LaBranche common stock and shares of non-convertible preferred stock of LaBranche having a value expected to be approximately $100 million. In addition, outstanding RPM stock options will be converted into options to acquire approximately 2.8 million shares of LaBranche common stock.

(01/18/01 Form 8–K, at 2.)

According to the Plaintiffs, a news release dated January 19, 2001 contained the following false and misleading statements:

The transaction will position LaBranche as the leading NYSE Specialist with 520 common stock listings and 27% of the dollar and share volume traded on the NYSE.

The acquisition will add 134 NYSE common stock listings to LaBranche's existing portfolio, including three components of the Dow Jones Industrial Average and 24 components of the S & P 500. LaBranche's new listings will include industry leaders such as Philip Morris, DuPont, Eastman Kodak, Bristol–Myers Squibb, Wells Fargo, United

Parcel Service and Nippon Telephone & Telegraph. In addition, the transaction also will include Robb Peck McCooey's 25% interest in a joint specialist account with R. Adrian & Co., LLC and Freedom Specialist, Inc., a subsidiary of Tucker Anthony Sutro, which acts as the NYSE Specialist for 29 listed companies, including four S & P 500 stocks.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Reaches Definitive Agreement to Acquire Robb Peck McCooey Financial Services, Inc," (Jan. 19, 2001) (*available at* http://www.labranche.com/newsinfo.html).)

Plaintiffs also allege that the following statement by M. LaBranche contained in the January 19, 2001 news release was false and misleading:

> We look forward to working with Robb Peck McCooey's Specialists and their listed companies. We believe the utilization of our capital combined with our trading expertise will increase our participation as principal and enhance liquidity in our new Specialist stocks. In addition, we are committed to growing Robb Peck McCooey's clearing business through new technologies, linking customers to our markets.

(*Id.*)

### 13. *The January 22, 2001 Earning Release*

Plaintiffs allege that the January 22, 2001 earnings release issued by LaBranche contained the following false and misleading statements:

> Revenues for the fourth quarter of $97 million were up 74% from $56 million in the same quarter last year. Net income increased to $22 million compared to $16 million in the same quarter of the prior year. Earnings per diluted share of $0.45 were 33% above the $0.34 in the fourth quarter last year on almost four million additional fully diluted shares outstanding. Cash earnings grew 70%

to $30 million versus $17 million in 1999's fourth quarter. Cash earnings per diluted share were $0.60, 57% above the $0.38 earned in the same quarter in 1999.

\* \* \* \* \* \*

> Revenues for the year ended December 31, 2000 were $345 million, a 72% increase from the $201 million reported in 1999. Net income grew substantially to $82 million compared to $29 million last year. Earnings per diluted share were $1.69, significantly above the $0.72 earned last year. Cash earnings reached $102 million, which represents earnings per diluted share of $2.10.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Reports Significant Increases in Revenue and Earnings for the Fourth Quarter and Year," (Jan. 22, 2001) (available at http://www.labranche.com/newsinfo.html).)

Plaintiffs also allege that the following statement by M. LaBranche contained in the January 19, 2001 news release was false and misleading:

> We are pleased to report solid financial results for the fourth quarter, illustrating the strength of our position in the world's largest market. Our strong revenue and earnings increases are attributable to increased NYSE trading volumes in conjunction with our above-average level of participation in the stocks for which we act as Specialist. . . .
>
> This past year was one of significant achievement for LaBranche. Through the successful execution of our strategy in a consolidating industry, we have substantially increased our size and market share with the acquisitions of Henderson Brothers and Webco Securities. Also, with the addition of Robb Peck McCooey, LaBranche will act as Specialist for 520 companies on the NYSE and increase our market share of dollar and

share volume to approximately 27%. LaBranche also began trading options on the American Stock Exchange during the fourth quarter. This represents an additional growth opportunity consistent with our strategy.

(*Id.*)

### 14. *The 2000 Form 10–K*

Plaintiffs allege that the March 30, 2001 annual report filed with the SEC—which was signed by M. LaBranche, Prendergast, Traison, Gallagher, Hayward,and Robb—contained the following false and misleading statements:

| | 2000 | 1999 | 1998 | 1997 | 1996 |
|---|---|---|---|---|---|
| **STATEMENT OF OPERATIONS DATA (in thousands)** | | | | | |
| **Revenues:** | | | | | |
| Net gain on principal transactions | $282,948 | $150,971 | $95,048 | $47,817 | $37,113 |
| Commissions | 45,381 | 37,222 | 26,576 | 15,186 | 10,180 |
| Other | 16,480 | 12,844 | 4,787 | 4,637 | 2,643 |
| Total revenues | 344,809 | 201,037 | 126,411 | 67,640 | 49,936 |

(03/30/01 10–K Statement for 2000, at 28.)

In addition, the 1999 10–K contained allegedly false and misleading statements concerning the NYSE rules governing specialist activities. (*See id.* at 13–15.) These statements are substantially similar to the previously discussed description of a specialist's responsibilities and obligations that appeared in the July 26, 1999 amended registration statement. (*See* subsection B1 above.) The 1999 10–K statement also contained allegedly false and misleading statements concerning risks to investors. (*See id.* at 29–30.) Finally, Plaintiffs allege that false and misleading statements were made in the 2000 10–K by the independent public accountants concerning compliance with G.A.A.P. (*See id.,* at F–2.) These statements are substantially similar to those contained in the 1999 10–K statement. (*See* Subsection B5 above.)

### 15. *The 2001 First Quarter Earnings Release*

Plaintiffs allege that the April 23, 2001 earnings release issued by LaBranche contained the following false and misleading statements:

Revenues for the first quarter were $98 million, a 24% increase compared to $79 million for the first quarter last year. Net income increased slightly to $21 million. Fully diluted earnings per share were $0.40 compared to $0.44 in the same quarter of 2000 on five million additional shares outstanding. Cash earnings grew 19% to $28 million from $24 million in the comparable period last year. Cash earnings per diluted share were $0.55, an 8% increase from the $0.51 reported in the first quarter of 2000.

Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Reports First Quarter Results—EPS $0.40

vs. $0.44 Year Earlier—Revenues Increase 24% to $98 Million, Cash Earnings $0.55 vs. $0.51 Year Earlier," (Apr. 23, 2001) (available at http://www.labranche.com/newsinfo.html).

Plaintiffs also allege that the following statement by M. LaBranche contained in the April 23, 2001 news release was false and misleading:

> Our financial performance was respectable given the difficult market environment. We had a solid quarter despite the challenges presented by the full implementation of trading in decimals and the substantial decline in the market. We achieved these results while maintaining the highest possible market quality for our listed companies. Our cash earnings of $28 million, or $0.55 per share, were our second highest ever....
>
> We continue to believe that market structure changes will lead to lower shareholder transaction costs, higher volumes and an increased role for the Specialist. In addition, we remain actively committed to pursuing strategic opportunities to expand our business and leverage our technology. Our acquisition of Robb Peck McCooey, which we completed on March 15, 2001 has strengthened our position and gives us greater flexibility to execute our growth strategy going forward.

(*Id.*)

## 16. *The First Quarter 2001 10-O*

Plaintiffs allege that LaBranche's May 15, 2001 quarterly report to the S.E.C., which was signed by Traison in his capacity as CFO, contained the following false and misleading statements:

**For the Three Months Ended March 31, 2001**

| | 2001 | 2000 |
|---|---|---|
| **REVENUES (in thousands):** | | |
| Net gain on principal transactions | $81,640 | $64,460 |
| Commissions | 11,820 | 12,035 |
| Other | 4,480 | 4,727 |
| Total revenues | 97,760 | 81,222 |

(05/15/01 10-Q Statement for the Quarter Ended March 31, 2001, at 3.) In addition the May 15, 2001 10-Q contained allegedly false and misleading statements concerning risk factors that were substantially similar to those contained in November 15, 1999 10-Q (*see* subsection B3 above) and a statement concerning compliance with G.A.A.P. and SEC regulations that was substantially similar to that contained in the August 24, 2000 10-Q (*see* subsection B9 above).

## 17. *The May 22, 2001 Press Release*

Plaintiffs allege that a May 22, 2001 press release issued by LaBranche contained the following false and misleading statements concerning LaBranche's acquisition of the NYSE specialist firm Bocklet & Co., LLC:

> LaBranche & Co Inc. (N.Y.SE: LAB), parent of one of the leading Specialist firms on the New York Stock Exchange, announced today that it has signed a letter of intent to acquire Bocklet & Co., LLC, the tenth largest Specialist firm on the New York Stock Exchange. Bocklet acts as the Specialist for 60 listed companies, seven of which are in the S & P 500 Index.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Announces Proposed Acquisition of Bocklet & Co., LLC" (May 22, 2001) (*available at* http://www.labranche.com/newsinfo.html).)

The May 22, 2001 press release also contained the following allegedly false and misleading statements by M. LaBranche:

This transaction underscores our commitment to providing service through an expanded platform of trading expertise and technology. Our prospective new partner is a firm with high quality stocks that present opportunities for improved trading through increased capital strength and enhanced capital utilization. Upon completion of the proposed transaction, LaBranche will act as the Specialist for 572 companies representing approximately 28% of the dollar volume traded on the NYSE.

(*Id.*)

**18. *The Second Quarter 2001 Earnings Release***

Plaintiffs allege that the July 23, 2001 earnings release issued by LaBranche contained the following false and misleading statements:

Revenues for the second quarter increased 29% to $113 million from $88 million in the second quarter last year. Net income was $19 million versus last year's $20 million. Earnings per diluted share were $0.29 compared to $0.41 in the second quarter of 2000 on approximately 10 million additional shares outstanding this year. Cash earnings grew 13% to $28 million from the $25 million reported in last year's second quarter. Cash earnings per diluted share were $0.49 compared to $0.51 in the same quarter of 2000.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Reports Second Quarter Results," (July 23, 2001) (available at http://www.labranche.com/newsinfo.html).)

Plaintiffs also allege that the following statement by M. LaBranche contained in the July 23, 2001 news release was false and misleading:

Our results are consistent with the guidance we provided on June 22 and reflect the current market environment and near term effect of decimalization. Given this challenging backdrop, we continue to report solid increases in revenues and cash earnings. In late May, we announced our intent to acquire Bocklet & Co., LLC. The addition of Bocklet's 60 listings will strengthen our leading position and expand the platform from which we can enhance services to our listed companies. We continue to make significant progress integrating Robb Peck McCooey's operations. We were awarded several new listings, including Kraft, the second largest IPO in history. While near term market conditions remain uncertain, we believe the continued successful execution of our strategy puts us in a very strong position going forward.

(*Id.*)

**19. *The Second Quarter 2001 10–Q***

Plaintiffs allege that LaBranche's August 14, 2001 quarterly report to the S.E.C., which was signed by Traison in his capacity as CFO, contained the following false and misleading statements:

| For the Three Months Ended June 30 | | |
| --- | --- | --- |
| | 2001 | 2000 |
| REVENUES (in thousands): | | |
| Net gain on principal transactions | $89,354 | $73,723 |
| Commissions | 16,491 | 11,147 |
| Other | 6,916 | 3,154 |
| Total revenues | 112,761 | 87,624 |

(08/14/01 10–Q Statement for the Quarter Ended June 30, 2001, at 3.) In addition the May 15, 2001 10–Q contained allegedly false and misleading statements concerning risk factors that were substantially similar to those contained in November 15, 1999 10–Q (*see* subsection B3 above) and a

statement concerning compliance with G.A.A.P. and SEC regulations that was substantially similar to that contained in the August 24, 2000 10–Q (*see* subsection B9 above).

### 20. *Third Quarter 2001 Earnings Release*

Plaintiffs allege that the October 22, 2001 earnings release issued by LaBranche contained the following false and misleading statement:

> Revenues for the third quarter were $89 million, a 10% increase from the $81 million reported in last year's third quarter. Net income was $11 million compared to $19 million in the same quarter in 2000. Earnings per diluted share were $0.15 on approximately nine million additional shares outstanding versus $0.38 in last year's third quarter. Cash earnings for the 2001 third quarter were $19 million compared to $24 million in the same quarter last year. Cash earnings per diluted share were $0.32 versus $0.48 in the comparable quarter last year.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Reports Third Quarter Results," (Oct. 22, 2001) (available at http://www.labranche.com/newsinfo.html).)

Plaintiffs also allege that the following statement by M. LaBranche contained in the October 22, 2001 earnings release was false and misleading: "We continue to move forward with our business plan and generate capital despite a difficult operating environment. We see great opportunities for our business in a changing marketplace." (*Id.*)

### 21. *The Third Quarter 2001 10–Q*

Plaintiffs allege that LaBranche's November 9, 2001 quarterly report to the S.E.C., which was signed by Traison in his capacity as CFO, contained the following false and misleading statements:

| For the Three Months Ended September 30 | | |
|---|---|---|
| | 2001 | 2000 |
| REVENUES (in thousands): | | |
| Net gain on principal transactions | $71,267 | $64,460 |
| Commissions | 14,784 | 12,035 |
| Other | 3,069 | 4,727 |
| Total revenues | 89,120 | 81,222 |

\* · \* \* \* \* \*

On August 13, 2001, LaBranche acquired all the assets relating to the AMEX operations of Cranmer & Cranmer, Inc. ("Cranmer"), a specialist in stocks and options on the AMEX, for an aggregate of approximately $9.2 million and 100,000 shares of the Company's common stock.

\* \* \* \* \* \*

On September 20, 2001, LaBranche acquired the remaining outstanding interest not already owned in the Freedom Specialist Inc., R. Adrian & Company, LLC, LaBranche & Co. LLC Joint Book (the "Joint Book") for an aggregate of $13.6 million and 54,750 shares of the Company's common stock.

(11/09/01 10–Q Statement for the Quarter Ended September, 2001, at 3, 11.) In addition the November 9, 2001 10–Q contained allegedly false and misleading statements concerning risk factors that were substantially similar to those contained in November 15, 1999 10–Q (*see* subsection B3 above) and a statement concerning compliance with G.A.A.P. and SEC regulations that was substantially similar to that contained in the August 24, 2000 10–Q (*see* subsection B9 above).

## 22. *January 18, 2002 Registration Statement*

Plaintiffs allege that the January 18, 2002 registration statement filed by La-Branche[4] with the SEC in connection with the sale of common stock by LaBranche insiders (including Hayward and Burke) contained the following false and misleading statements.

Our business has grown considerably during the past five years. Our revenues have increased from approximately $49.9 million in 1996 to $424.1 million in 2001, representing a compound annual growth rate of 53.4%.

\* \* \* \* \* \*

Because our specialist activities expose our capital to significant risks, managing these risks is a constant priority for us. Our central role in the auction process helps us to reduce risks by enabling us to incorporate up-to-date market information in the management of our inventory, subject to our specialist obligations. In addition, we have developed a risk management process which is designed to balance our ability to profit from our specialist activities with our exposure to potential losses. Our risk management process includes participation from our executive operating committee, our floor management committee, our floor team captains and our specialists.

(01/18/02 Form S–3 Registration Statement, at 1, 2.)

## 23. *January 18, 2002 Earnings Release*

Plaintiffs allege that the January 18, 2002 earnings release issued by La-Branche contained the following false and misleading statement:

Revenues for the fourth quarter grew 28% to $125 million from $97 million in last year's fourth quarter. Cash earnings for the 2001 fourth quarter were equal to last year's cash earnings of $30 million. Cash earnings per diluted share were $0.50 versus $0.60 on ten million additional shares outstanding in the comparable quarter last year. Net income available to common shareholders was $18 million, or $0.30 per diluted share, compared to $22 million, or $0.45 per diluted share, in the same quarter in 2000.

For the year ended December 31, 2001, revenues increased 23% to $424 million from $345 million in 2000. Cash earnings grew to $105 million from $102 million last year. Cash earnings per diluted share were $1.85 versus $2.10 in 2000 on approximately eight million additional shares outstanding. Net income available to common shareholders was $64 million, or $1.13 per diluted share, compared to $82 million, or $1.69 per diluted share, in the same period last year.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Reports Fourth Quarter and 2001 Year End Results," (Jan. 18, 2002) (available at http://www.labranche.com/newsinfo.html).)

Plaintiffs also allege that the following statement by M. LaBranche contained in the January 18, 2002 earnings release was false and misleading:

These earnings reflect the progress we are making coming off a very difficult period. We were able to successfully execute our business plan despite the difficulties experienced in 2001. While we are cautious about near-term market conditions affecting our business, we be-

---

4. This statement was signed by M. La-Branche, Prendergast, Traison, Gallagher, Hayward, and Murphy.

lieve that LaBranche is well positioned to grow in a technologically changing marketplace. . . .

2001 was a significant year for La-Branche. We successfully made the transition to decimalization, which will lower costs for investors and increase volumes. We strengthened our franchise on the NYSE and established a significant presence on the American Stock Exchange. The addition of Internet Trading Technologies (ITTI) early last year successfully positioned La-Branche as a provider of end-to-end Order execution, analysis and reporting solutions. Looking ahead to 2002, we believe that by remaining focused on managing our growth and pursuing strategic opportunities, we will continue to deliver value to both our listed companies and shareholders.

(*Id.*)

### 24. The 2001 Form 10–K

Plaintiffs allege that the March 15, 2002 annual report filed with the SEC—which was signed by M. LaBranche, Prendergast, Traison, Gallagher, Hayward, and Robb—contained the following false and misleading statements:

| | 2001 | 2000 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|
| **STATEMENT OF OPERATIONS DATA (in thousands)** | | | | | |
| **Revenues:** | | | | | |
| Net gain on principal transactions | $340,795 | $282,948 | $150,971 | $95,048 | $47,817 · |
| Commissions | 62,866 | 45,381 | 37,222 | 26,576 | 15,186 |
| Other | 20,469 | 16,480 | 12,844 | 4,787 | 4,637 |
| Total revenues | 424,130 | 344,809 | 201,037 | 126,411 | 67,640 |

(03/15/02 10–K Statement for 2001, at 26.)

In addition, the 2001 10–K contained is alleged to contain false and misleading statements concerning the sources of La-Branche's revenue. (*See id.* at 28). These statements are substantially similar to previously discussed statements contained in the 1999 10–K. Plaintiffs allege that false and misleading statements were made in the 2001 10–K by the independent public accountants concerning compliance with G.A.A.P. (*See id.,* at F–2.) These statements are substantially similar to those contained in the 1999 10–K statement. The 2001 10–K is also alleged to contain false and misleading statements concerning the NYSE rules governing specialist activities. (*See id.* at 13–15.) These statements are substantially similar to the pre-viously discussed description of a specialist's responsibilities and obligations that appeared in the July 26, 1999 amended registration statement. The 2001 10–K statement also contained allegedly false and misleading statements concerning risks to investors. (*See id.* at 29–30.)

### 25. First Quarter 2002 Earnings Release

Plaintiffs allege that the April 19, 2002 earnings release issued by LaBranche contained the following false and misleading statement:

LaBranche & Co Inc. (N.Y.SE: LAB), parent of one of the leading Specialist firms on the New York Stock Exchange, today reported that its 2002 first quarter

revenues grew 25% to $123 million from $98 million in last year's first quarter. Net income available to common shareholders grew 25% to $26 million for the 2002 first quarter, compared to $21 million in the 2001 first quarter, and earnings per diluted share increased 6% to $0.43 for the 2002 first quarter, with 9 million additional shares outstanding, from $0.40 per diluted share in the 2001 first quarter.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Reports First Quarter Earnings," (Apr. 19, 2002) (available at http://www.labranche.com/newsinfo.html).)

Plaintiffs also allege that the following statement by M. LaBranche contained in the April 19, 2002 earnings release was false and misleading: "LaBranche continues to demonstrate the strength of its business model as technology and market structure changes move the equity trading business to scale." (*Id.*)

### 26. *First Quarter 2002 10–Q*

Plaintiffs allege that LaBranche's May 15, 2002 quarterly report to the S.E.C., which was signed by Traison in his capacity as CFO, contained the following false and misleading statements:

**For the Three Months Ended March 31**

| | 2002 | 2001 |
|---|---|---|
| **REVENUES (in thousands):** | | |
| Net gain on principal transactions | $ 89,124 | $81,640 |
| Commissions | 20,973 | 11,820 |
| Other | 12,583 | 4,480 |
| | | |
| Total revenues | 122,680 | 97,760 |

(05/15/02 10–Q Statement for the Quarter Ended March 31, 2001, at 3.) In addition the May 15, 2002 10–Q contained allegedly

false and misleading statements concerning risk factors that were substantially similar to those contained in November 15, 1999 10–Q and a statement concerning compliance with G.A.A.P. and SEC regulations that was substantially similar to that contained in the August 24, 2000 10–Q (*See* subsection B9 above).

### 27. *The Second Quarter 2002 Earnings Release*

Plaintiffs allege that the July 19, 2002 earnings release issued by LaBranche contained the following false and misleading statement:

LaBranche & Co Inc. (N.Y.SE: LAB), parent of one of the leading Specialist firms on the New York Stock Exchange, today reported that its second quarter 2002 revenues were $98 million compared to $113 million in last year's second quarter. Net income available to common shareholders was $13 million compared to $17 million in the second quarter of 2001, and earnings per diluted share for the 2002 second quarter were $0.22 with 1.6 million additional shares outstanding, compared to $0.29 in the prior year period. The results for the 2002 second quarter also reflect the implementation of new accounting and reporting standards (SFAS No. 142) under which acquired goodwill and other intangible assets are no longer amortized. Had SFAS No. 142 been effective for the 2001 second quarter, LaBranche's net income available to common shareholders for that period would have been $25 million or $0.43 per diluted share . . . .

For the six months ended June 30, 2002, revenues increased to $221 million from $211 million in last year's comparable period. Net income available to common shareholders grew modestly to $39 million for the six months ended June 30, 2002 from $37 million in the first six

months of last year. Earnings per diluted share were $0.65 on approximately 5 million additional shares outstanding versus $0.68 in 2001. As previously reported, first quarter 2002 net income included an after-tax gain of $5 million, or $0.08 per diluted share, related to the revaluation of a LaBranche investment, and an after-tax charge of $1 million, or $0.02 per diluted share, related to LaBranche's repurchase of a portion of its outstanding shares of preferred stock. Had SFAS No. 142 been effective for the six months ended June 30, 2001, LaBranche's net income available to common shareholders for that period would have been $50 million or $0.91 per diluted share.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Reports Second Quarter Results," (July 19, 2002) (available at http://www.labranche.com/newsinfo.html).)

## 28. Second Quarter 2002 10–Q

Plaintiffs allege that LaBranche's August 14, 2002 quarterly report to the S.E.C., which was certified by Traison in his capacity as CFO and M. LaBranche in his capacity as chairman and CEO, contained the following false and misleading statements:

**For the Three Months Ended June 30**

| | 2002 | 2001 |
|---|---|---|
| REVENUES (in thousands): | | |
| Net gain on principal transactions | $72,731 | $ 89,354 |
| Commissions | 22,420 | 16,491 |
| Other | 2,957 | 6,916 |
| Total revenues | 98,108 | 112,761 |

(08/14/02 10–Q Statement for the Quarter Ended March 31, 2002, at 3.) In addition the August 14, 2002 10–Q contained alleg-

edly false and misleading statements concerning risk factors that were substantially similar to those contained in November 15, 1999 10–Q (see section B5 above) and a statement concerning compliance with G.A.A.P. and SEC regulations that was substantially similar to that contained in the August 24, 2000 10–Q (see subsection B9 above).

## 29. Third Quarter 2002 Earnings Release

Plaintiffs allege that the October 18, 2002 earnings release issued by LaBranche contained the following false and misleading statement:

LaBranche & Co Inc. (N.Y.SE: LAB), parent of one of the leading Specialist firms on the New York Stock Exchange, today reported that its second quarter 2002 revenues were $98 million compared to $113 million in last year's second quarter. Net income available to common shareholders was $13 million compared to $17 million in the second quarter of 2001, and earnings per diluted share for the 2002 second quarter were $0.22 with 1.6 million additional shares outstanding, compared to $0.29 in the prior year period. The results for the 2002 second quarter also reflect the implementation of new accounting and reporting standards (SFAS No. 142) under which acquired goodwill and other intangible assets are no longer amortized. Had SFAS No. 142 been effective for the 2001 second quarter, LaBranche's net income available to common shareholders for that period would have been $25 million or $0.43 per diluted share. . . .

For the six months ended June 30, 2002, revenues increased to $221 million from $211 million in last year's comparable period. Net income available to common shareholders grew modestly to $39

million for the six months ended June 30, 2002 from $37 million in the first six months of last year. Earnings per diluted share were $0.65 on approximately 5 million additional shares outstanding versus $0.68 in 2001. As previously reported, first quarter 2002 net income included an after-tax gain of $5 million, or $0.08 per diluted share, related to the revaluation of a LaBranche investment, and an after-tax charge of $1 million, or $0.02 per diluted share, related to La-Branche's repurchase of a portion of its outstanding shares of preferred stock. Had SFAS No. 142 been effective for the six months ended June 30, 2001, LaBranche's net income available to common shareholders for that period would have been $50 million or $0.91 per diluted share.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Reports Third Quarter Results," (Oct. 18, 2002) (available at http://www.la-branche.com/newsinfo.html).)

Plaintiffs also allege that the following statement by M. LaBranche contained in the October 18, 2002 earnings release was false and misleading: "These results demonstrate the strength of LaBranche's position as our business continues to move to scale." (*Id.*)

### 30. *Third Quarter 2002 10-Q*

Plaintiffs allege that LaBranche's November 14, 2002 quarterly report to the S.E.C., which was certified M. LaBranche in his capacity as chairman and CEO, contained the following false and misleading statements:

**For the Three Months Ended September 30**

| | 2002 | 2001 |
|---|---|---|
| REVENUES (in thousands): | | |
| Net gain on principal transactions | $ 93,829 | $71,267 |
| Commissions | 24,383 | 14,784 |
| Other | 53 | 3,069 |
| Total revenues | 118,265 | 89,120 |

\* \* \* \* \* \*

### ITEM 4. CONTROLS AND PROCEDURES

An evaluation was performed on the effectiveness of the design and operation of our disclosure controls and procedures, within the 90–day period prior to filing this report, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that the design and operation of our disclosure controls and procedures were effective. No significant changes were made in our internal controls or in other factors that could significantly affect these controls subsequent to the date of their evaluation.

(11/14/02 10–Q Statement for the Quarter Ended September 30, 2002, at 3.) In addition the November 14, 2002 10–Q contained allegedly false and misleading statements concerning risk factors that were substantially similar to those contained in November 15, 1999 10–Q (*see* section B5 above) and a statement concerning compliance with G.A.A.P. and SEC regulations that was substantially similar to that contained in the August 24, 2000 10–Q (*see* subsection B9 above).

### 31. *The January 17, 2003 Earnings Release*

Plaintiffs allege that the January 17, 2003 earnings release issued by La-Branche contained the following false and misleading statements:

Revenues for the fourth quarter were $114 million compared to $124 million for the fourth quarter of 2001. Net income available to common shareholders grew to $22 million from $18 million in last year's comparable quarter, and earnings per diluted share for the 2002 fourth quarter were $0.36 compared to $0.30 in the prior year period. . . .

For the twelve months ended December 31, 2002, revenues grew to $453 million from $424 million in the prior year. Net income available to common shareholders increased to $80 million from $64 million in 2001. Earnings per diluted share were $1.34 compared to $1.13 in the prior year.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Reports Fourth Quarter and Full–Year Results; Declares Cash Dividend of $0.08 Per Share," (Jan. 17, 2003) (available at http://www.labranche.com/newsinfo.html).)

Plaintiffs also allege that the following statement by M. LaBranche contained in the January 17, 2003 earnings release was false and misleading: "LaBranche's record of delivering sound financial results reflects the strength of our business model. In these challenging market conditions, we have generated capital and built our franchise to benefit our shareholders and listed companies." (*Id.*)

### 32. *The 2002 Form 10–K*

Plaintiffs allege that the March 20, 2003 annual report filed with the SEC—which was signed by M. LaBranche, Hayward, Murphy, and Traison—contained the following false and misleading statements:

| | 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|
| **STATEMENT OF OPERATIONS DATA (in thousands)** | | | | | |
| **Revenues:** | | | | | |
| Net gain on principal transactions | $342,400 | $340,795 | $282,948 | $150,971 | $95,048 |
| Commissions | 92,044 | 62,866 | 45,381 | 37,222 | 26,576 |
| Other | 18,401 | 20,469 | 16,480 | 12,844 | 4,787 |
| Total revenues | 452,845 | 424,130 | 344,809 | 201,037 | 126,411 |

(03/20/03 10–K Statement for 2003, at 17.)

In addition, the 2002 10–K is alleged to contain false and misleading statements concerning the NYSE and AMEX rules governing specialist activities. (*See id.* at 9–10.) Plaintiffs also allege that the certifications by LaBranche, Traison and the the independent public accountants concerning the accuracy of the 2002 10–K were false and misleading. (*See id.,* at 49–52.)

### 33. *March 31, 2003 Earnings Release*

Plaintiffs allege that the March 31, 2003 earnings release issued by LaBranche contained the following false and misleading statements:

LaBranche is currently forecasting diluted earnings per share of 6 to 8 cents for the first quarter of 2003. Geopolitical uncertainty and continued pressure on equity prices have resulted in both lower dollar volumes on the NYSE and lower dollar volumes traded by LaBranche as principal. LaBranche traded approximately $189 billion as princi-

pal on the NYSE in the first quarter of 2003 versus $260 billion in the first quarter of 2002, a decline of 28%. This difficult trading environment was reflected in lower principal trading revenues of approximately $52 million for the first quarter of 2003 versus $89 million in the first quarter of 2002, producing a realization rate of 2.7 basis points for the first quarter 2003 versus 3.4 basis points in the first quarter of 2002. LaBranche estimates total revenues for the first quarter of 2003 of approximately $76 million as compared with $123 million in the first quarter of 2002.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Provides Anticipated First Quarter Results," (Mar. 31, 2003) (available at http://www.labranche.com/newsinfo.html).)

### 34. *First Quarter 2003 Earnings Release*

Plaintiffs allege that the April 15, 2003 earnings release issued by LaBranche contained the following false and misleading statements:

> Revenues for the first quarter were $77 million compared to $123 million for last year's first quarter. Net income available to common shareholders was $4.4 million, or $0.07 per diluted share, compared to $25.6 million, or $0.43 per diluted share, for the 2002 first quarter. First quarter, 2003 earnings include an after-tax charge of $0.9 million, or $0.02 per diluted share related to LaBranche's repurchase of a portion of its outstanding shares of preferred stock. As previously reported, first quarter 2002 net income included an after-tax gain of $5 million, or $0.08 per diluted share, related to the revaluation of a LaBranche investment, and an after-tax charge of $1 million, or $0.02 per diluted share, related to LaBranche's repurchase of a portion of its outstanding shares of pre-

ferred stock. Excluding these items, 2002 first quarter net income would have been $22 million, or $0.37 per diluted share.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Reports First Quarter Results," (Apr. 15, 2003) (available at http://www.labranche.com/newsinfo.html).)

Plaintiffs also allege that the following statement by M. LaBranche contained in the April 15, 2003 earnings release was false and misleading:

> Our results are consistent with the guidance we provided on March 31st and reflect the ongoing uncertainties affecting equity markets and prices. Our focus on providing the best order execution and service to our listed companies, growing potentially profitable lines of business and containing expenses will be beneficial for our shareholders.

(*Id.*)

### 35. *First Quarter 2003 10-Q*

Plaintiffs allege that LaBranche's May 15, 2003 quarterly report to the S.E.C., which was certified M. LaBranche in his capacity as chairman and CEO and by Traison in his capacity as CFO, contained the following false and misleading statements:

**For the Three Months Ended March 31**

| | 2003 | 2002 |
|---|---|---|
| **REVENUES (in thousands):** | | |
| Net gain on principal transactions | $51,803 | $ 89,124 |
| Commissions | 22,516 | 20,973 |
| Other | 2,315 | 12,583 |
| Total revenues | 76,634 | 122,680 |
| **Earnings Per Share** | | |

| | | |
|---|---|---|
| Basic | $0.07 | $0.44 |
| Diluted | $0.07 | $0.44 |

\* \* \* \* \* \*

Net gain on principal transactions decreased as a result of the unfavorable market conditions resulting from global economic and geopolitical uncertainties during the first quarter of 2003 as compared to the same period in 2002. During the first quarter of 2003, the aggregate share volume of our specialist stocks traded on the NYSE decreased 7.6% to 23.2 billion shares from 25.1 billion shares for the same period in 2002, while the aggregate dollar volume of our specialist stocks traded on the NYSE decreased 20.0% to $566.7 billion during the first quarter of 2003 from $708.8 billion for the same period in 2002. Notwithstanding these unfavorable market conditions, we were required to fulfill our obligation as a specialist to minimize short-term imbalances between supply and demand and maintain fair and orderly markets in our listed company stocks.

\* \* \* \* \* \*

Employee compensation and related benefits expense decreased as a result of a reduction in bonus accruals and other employee benefit accruals. The decrease was partially offset by a slight increase in employee salaries due to the hiring of additional trading personnel for our options specialist activities and institutional execution services group, which increased our average number of employees by approximately 41 individuals for the three months ended March 31, 2003, as compared to the same period in 2002. Employee compensation and related benefits expense increased to 33.7% of total revenues for the three months ended March 31, 2003, from 25.3% of total revenues for the same period in 2002.

\* \* \* \* \* \*

As registered broker-dealers, LaBranche & Co. LLC, LFSI and LSP are subject to certain regulatory requirements intended to insure their general financial soundness and liquidity. These subsidiaries are subject to SEC Rule 15c3–1, 15c3–3 and other requirements as adopted and administered by both the NYSE and AMEX.

\* \* \* \* \* \*

On April 22, 2003, the NYSE announced that it was reviewing the trading practices of several specialist firms, including our subsidiary specialist firm, LaBranche & Co. LLC. The investigation presently focuses on the trading requirement that NYSE specialist firms not intervene in a natural match between a buyer and a seller. While we believe that our subsidiary has operated in accordance with all applicable requirements, the investigation is in an early stage and there can be no assurance as to the outcome of the investigation or its effects, if any, on our financial condition.

(05/15/03 10–Q Statement for the Quarter Ended September 30, 2002, at 3, 16, 27, 28.)

### 36. *Second Quarter 2003 Earnings Release*

Plaintiffs allege that the July 18, 2003 earnings release issued by LaBranche contained the following false and misleading statements:

Revenue for the 2003 second quarter was $88 million compared to $98 million in last year's second quarter. Net income available to common shareholders was $10.6 million, or $0.18 per diluted share, versus $13.2 million, or $0.22 per

diluted share, in the 2002–second quarter.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Reports Second Quarter Results," (July 18, 2003) (available at http://www.labranche.com/newsinfo.html).)

### 37. *Second Quarter 2003 10–Q*

Plaintiffs allege that LaBranche's August 13, 2003 quarterly report to the S.E.C., which was signed by M. LaBranche Traison, contained the following false and misleading statements:

**For the Three Months Ended March 31**

| | 2003 | 2002 |
| --- | --- | --- |
| REVENUES (in thousands): | | |
| Net gain on principal transactions | $60,103 | $72,731 |
| Commissions | 24,859 | 22,420 |
| Other | 2,542 | 2,957 |
| Total revenues | 87,504 | 98,108 |
| Earnings Per Share | | |
| Basic | $0.18 | $0.22 |
| Diluted | $0.18 | $0.22 |

\* \* \* \* \* \*

Net gain on principal transactions decreased as a result of a decrease in the dollar value and share volume of principal shares traded during the second quarter of 2003 as compared to the same period in 2002. During the second quarter of 2003, the aggregate dollar value of principal trades decreased 26.0% to $187.9 billion from $253.9 billion for the same period in 2002, and the aggregate share volume of principal trades decreased 16.9% to 7.4 billion shares during the second quarter of 2003 from 8.9 billion shares for the same period in 2002. Of the total $60.1 million and $72.7 million of net gain on principal

transactions during the second quarter of 2003 and 2002, respectively, $5.2 million and ($0.7) million, respectively, were from our derivative trading activities.

\* \* \* \* \* \*

On April 22, 2003, the NYSE announced that it was reviewing the trading practices of several specialist firms, including our subsidiary specialist firm, LaBranche & Co. LLC. The investigation presently focuses on the trading requirement that NYSE specialist firms not intervene in a natural match between a buyer and a seller.

In connection with this investigation, the NYSE's Division of Enforcement recently served our LaBranche & Co. LLC subsidiary with a so-called "Charge Memorandum" as a result of LaBranche & Co. LLC's refusal to furnish the NYSE's Division of Enforcement with copies of all personal e-mail messages sent or received by certain of its specialists and other employees since January 2002. LaBranche & Co. LLC personnel have given a number of on-the-record interviews to the NYSE, and LaBranche & Co. LLC has produced numerous documents, including many thousands of e-mail messages, but has not produced personal e-mail messages in order to protect its employees' privacy rights and because it does not believe that such messages have any bearing on any of LaBranche & Co. LLC's business activities or are at all relevant to the pending NYSE investigation. LaBranche & Co. LLC has sought to comply with the NYSE's Division of Enforcement inquiry by offering to furnish copies of the disputed e-mail messages to an independent third party for a determination of whether they are relevant to the ongoing investigation, but the NYSE's Division of Enforcement has refused this

offer. We believe that we are fully cooperating with this ongoing investigation, but we intend to contest vigorously the NYSE's Division of Enforcement efforts to obtain copies of its specialists' and other employees' non-business e-mail messages. Toward this end, LaBranche & Co. LLC filed with the NYSE on August 12, 2003 a formal answer to the Charge Memorandum, in which it denied the NYSE's Division of Enforcement charge that it has failed to cooperate with the NYSE's investigation.

\* \* \* \* \* \*

Believing that it is inappropriate for him to continue to serve as Vice Chairman and Director of the NYSE while the NYSE's investigation of LaBranche & Co. LLC's trading practices is ongoing and particularly in the aftermath of the issuance by the NYSE's Division of Enforcement of the Charge Memorandum described above, Robert M. Murphy, the Chief Executive Officer of LaBranche & Co. LLC, resigned from his positions with the NYSE on August 7, 2003.

\* \* \* \* \* \*

On April 22, 2003, the NYSE announced that it was reviewing the trading practices of several specialist firms, including our subsidiary specialist firm, LaBranche & Co. LLC. The investigation presently focuses on the trading requirement that NYSE specialist firms not intervene in a natural match between a buyer and a seller. While we believe that our subsidiary has operated in accordance with all applicable requirements, the investigation is in an early stage and there can be no assurance as to the outcome of the investigation or its effects, if any, on our financial condition. (05/15/03 10–Q Statement for the Quarter Ended September 30, 2002, at 3, 20, 36, 28.)

### 39. *October 1, 2003 Earnings Release*

Plaintiffs allege that the October 1, 2003 earnings release issued by LaBranche contained the following false and misleading statements:

LaBranche & Co Inc. (N.Y.SE: LAB), parent of one of the leading Specialist firms on the New York Stock Exchange, announced today that diluted earnings per share for the third quarter of 2003 will likely be in a range of $0.03 to $0.05 per share versus consensus analyst estimates of $0.17 per share.

LaBranche said the continued depressed equity trading environment impacted the quarter, which was characterized by low market volatility and a reduced need for LaBranche to trade as principal. LaBranche's principal trading volume for the third quarter was approximately $176 billion versus $247 billion in the third quarter 2002 and $188 billion in the second quarter 2003. Principal trading at LaBranche LLC amounted to approximately $40 million in the third quarter, yielding a realization rate of 2.3 basis points. LaBranche also said principal trading revenues for September 2003 were the lowest for any month since October 1999. While the equity markets have shown some signs of improvement, such as the recent pick-up in the IPO activity, secondary trading on the NYSE remains subdued.

(Press Release, LaBranche & Co. Inc. Investor Relations, "LaBranche & Co. Provides Anticipated Third Quarter Results; Comments on NYSE Investigation," (Oct. 1, 2003) (available at http://www.labranche.com/newsinfo.html).)